**RESERVE LIFE INSURANCE COMPANY, Appellant,**

v.

**Emma M. THOMAS et al., Co-Executors of the Estate of Willie B. Thomas, Deceased, Appellees.**

Court of Appeals of Kentucky.

Feb. 14, 1958.

John E. Richardson, Richardson & Barrickman, Glasgow, for appellant.

J. W. Vance, Jr., Glasgow, for appellees.

MILLIKEN, Judge.

Reserve Life Insurance Company, of Dallas, Texas, appellant, entered into a contract of hospitalization insurance with Willie B. Thomas, now deceased, on January 24, 1955. No medical examination was required. In December of that year Mr. Thomas was taken to Samson Community Hospital at Glasgow, Kentucky, where he remained until his death on February 6, 1956. His widow and his son, appellees, sought to collect on the policies of Reserve, but Reserve refused to pay. They then filed this action on the policies in the Barren Circuit Court and obtained a judgment for $1,123, from which Reserve entered its motion for appeal to this court.

It is Reserve's contention that the policies were void because of the manner in which they were obtained by Thomas. To substantiate this contention, Reserve relies heavily upon the testimony of Mrs. Thomas concerning her late husband's health and the negotiations between him and Reserve's agent, Hunt. The substance of her testimony is as follows: (1) The agent, Hunt, sold Thomas the policies on January 24, 1955; (2) Hunt had been by to see her husband quite a few times prior to that date in an effort to sell the insurance to him; (3) her husband wanted the insurance, but was afraid he couldn't get it because he had been sick for some time with an ulcerated stomach; (4) her husband had had an exploratory operation of the stomach in 1953; (5) during the fall of 1955, after Mr. Thomas entered the hospital, Reserve paid $128 on the policies for seven days' illness time; (6) her husband had been going to doctors off and on for thirty years because of stomach troubles; (7) her husband's signature was on the application for insurance; (8) the questions numbered 6, 8 and 9 on the application for the policies were answered "No," which answers were false (these questions were those customarily asked concerning the state of applicant's health, whether he has had certain diseases or ailments—including stomach trouble—and whether he has had surgical advice or treatment in the past three years; (9) Reserve's agent, Hunt, knew that her husband had had the exploratory operation in 1953; (10) the agent, Hunt, told Mr. Thomas that "this policy will be o. k. if you ever have to go to the hospital any more and have an operation; if it is adhesions again which it was the first time, the doctors said, that your policy will be no good, but if it is anything else besides adhesions, says your policy will be .o. .k.;". (11) the agent filled in the blanks

after the questions were answered; (12) the agent was told by her husband of his illness and operation in 1953; (13) all premiums had been paid; (14) she was not present when the application was signed and heard no conversation between her husband and the agent at that time, but had heard the conversations on previous visits of the agent; (15) her husband explained his illness to the agent because he was afraid he couldn't get the insurance because of the illnesses; (16) her husband had tried to get insurance before but was refused; (17) the agent filled out the application with full knowledge of her husband's previous medical history; and (18) her husband could read and write and was a good businessman.

The foregoing testimony was uncontradicted, and both Reserve and the appellees rely heavily upon it in support of their respective contentions.

The action was submitted to the jury under instructions which, in substance, required the jury to find for Reserve in any of the following instances: (1) If W. B. Thomas, deceased, knowingly misrepresented to the agent of appellant any facts pertaining to his health which were essential to obtaining the policies; (2) if W. B. Thomas knew he had a cancerous condition and failed to reveal this to the agent; (3) if there was collusion on the part of Thomas and Hunt, the agent; (4) if any of the answers made by Thomas about his health were untrue, even though he did not know they were false and had no intention of deceiving the agent of Reserve; (5) if Thomas gave false answers with the intent to deceive the agent. The jury was further instructed that they could find for appellees if Thomas informed the agent of his former illnesses and the agent went on and filled in the false answers without knowledge, consent, or collusion on Thomas' part.

The application, a copy of which is attached to the policy, contains no notice to the insured concerning any limitations on the power of the Company's agent, but does require the signature of the applicant after notification to him that no insurance was effective until a policy was actually issued by the Company. The policy contains a provision that the Company's agents have no authority to waive any of its provisions without the approval of the home office. There appears to be no question but that the answers on the application were false; the only questions are whether the applicant gave truthful answers but the agent jotted down untruthful ones in order to sell the policy and collect his commission, or whether the applicant and agent colluded in order for the applicant to get the protection of the policy and the agent collect a commission for selling it. In Kentucky, "misrepresentations, unless material or fraudulent, shall not prevent a recovery on the policy." KRS 304.656. The misrepresentations here were certainly material to the issuance of the policy. If the agent of the Company put down wrong answers in order to sell the policy, the applicant nevertheless signed the application. Was there a duty on the applicant's part to read the application which was filled in by the agent? Or is the applicant entitled to rely upon the agent, who is presumably experienced in the field of insurance, and to take for granted that the agent acted properly within the scope of his authority? The answers to these questions are important because a hard and fast rule on the subject could lead to an insurance company unjustly avoiding payment on a policy as well as affording an opportunity to an applicant to obtain insurance when he was not entitled to it.

■ The misrepresentations here involved were made in the inception of the insurance contract, and parol evidence should be admitted to show the circumstances under which the insurance policy—the contract—was procured. The courts of the country do not agree on this point, and also do not agree on the effect of the insured's failure to read either the policy or the application for it. See Vance on Insurance (1951 Hornbook), Section 44.

This court recently has placed more responsibility on an applicant for insurance to see to it that his representations to the company approach the truth, Commonwealth Life Insurance Co. v. Keen, 1950, 331 Ky. 301, 231 S.W.2d 78, Metropolitan Life Insurance Co. v. Tannenbaum, 1951, Ky., 240 S.W.2d 566, National Life and Accident Insurance Co. v. Scott, 240 S.W.2d 849, and, according to Vance, the trend in recent 'cases is in this direction.

However, in the case at bar, the evidence discloses that the representations in the application were so palpably false that recovery on the policy should not be permitted regardless of who was responsible for insertion of the false answers. For this reason, the judgment is reversed.