**HIGHLANDS INSURANCE COMPANY**

v.

**GERBER PRODUCTS CO.**

Civ. No. JFM–87–2619.

United States District Court, D. Maryland.

Nov. 14, 1988.

---

Stephen A. Fennell and Anita G. Raby, Steptoe & Johnson, Washington, D.C., for plaintiff.

Angus Everton, Andrew M. McDonald and Louis Close, Whiteford, Taylor & Preston, Baltimore, Md., Debra A. Jung and Timothy G. Reynolds, Skadden, Arps, Slate, Meagher & Flom, New York City, C. Mac-Nair Speed, Baltimore, Md., and James P. Schaller, Rockville, Md., for defendant.

### MEMORANDUM

MOTZ, District Judge.

Highlands Insurance Company instituted this declaratory judgment action against Gerber Products Company. AIU Insurance Company, American Insurance Company and Federal Insurance Company have been joined as third party defendants.

### Facts

From April 1, 1984 to April 1, 1985, Gerber carried a $1 million primary liability insurance policy with Liberty Mutual Insurance Company and a $25 million first-level excess policy with Mission National Insurance Company. Highlands, AIU, American and Federal together provided Gerber with second-level excess coverage in the aggregate amount of $75 million. The respective shares of their coverage were $10 million, $10 million, $40 million and $15 million.

On March 5, 1985, Lindsey Holmes, a child, suffered injuries in an automobile accident while seated in a car seat manufactured by Century Products, Inc., a wholly-owned subsidiary of Gerber and an insured under all of Gerber's policies. Gerber settled the ensuing tort suit for a sum which is undisclosed but which Gerber represents as being in excess of $1 million. The settlement proceeds therefore exhausted the primary coverage provided by Liberty Mutual.

Mission National, which provided Gerber's first level of excess coverage, has been declared insolvent. As a consequence, Gerber seeks to require Highlands, AIU, American, and Federal to drop down into Mission National's place and provide first-level excess coverage in its stead.

Each of the insurers has moved for summary judgment.

### I.

Three preliminary questions must be briefly addressed.

First, contending that there are ambiguities in the terms of the subject policies, Gerber asserts that summary judgment disposition is inappropriate. An unstated corollary of this assertion is that summary judgment disposition is appropriate if there are no material ambiguities in the policies. *See Radiator Specialty Co. v. First State Ins. Co.*, 651 F.Supp. 439 (W.D.N.C.), *aff'd*, 836 F.2d 193 (4th Cir.1987).

Second, Gerber argues that it should be permitted discovery focusing on the question of whether the second-level excess insurers contemplated that they might be required to drop down to provide coverage in the event of the insolvency of Mission National. If, however, there are no ambiguities in the policies, extrinsic evi-

dence on this point would be inadmissible under the parol evidence rule.

Third, the parties are in dispute as to whether the law of Maryland governs the questions here presented. However, none of the parties have relied upon any authority which suggests that Maryland law differs on any material point from the law of any other state. Since "a difference in law" would thus not "make a difference in outcome," the conflicts question is an academic one. *See Zurich Insurance Co. v. Heil Co.,* 815 F.2d 1122, 1123 (7th Cir. 1987).[1]

### II.

■ An insurance policy is to be read like any contract, and the words which it contains are to be given their ordinary meaning. *See, e.g., Chicago Insurance Co. v. Pacific Indemnity Co.,* 502 F.Supp. 725, 727 (D.Md.1980). Each of the policies here in question clearly state that they are providing *excess* insurance coverage. In its ordinary usage, the word "excess" means "over and above;" it does not mean "down into." Thus, excess carriers ordinarily are not required to provide drop-down coverage in the event of the insolvency of an underlying insurer. *See, e.g., Continental Marble & Granite v. Canal Insurance Co.,* 785 F.2d 1258 (5th Cir.1986); *Radiator Specialty Co. v. First State Insurance Co., supra.*

An exception to this general rule exists only where an insurer has used language in its policy which creates a genuine ambiguity as to the scope of coverage. *See, e.g., Donald B. MacNeal Inc. v. Interstate Fire & Casualty Co.,* 132 Ill.App.3d 564, 87 Ill.Dec. 794, 477 N.E.2d 1322 (1985); *Reserve Insurance Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (1982); *Gros v. Houston Fire & Casualty Ins. Co.,* 195 So.2d 674 (La.App.1967). Clauses indicating that the excess insurer will provide coverage over underlying "collectible" or "recoverable" insurance have been found to create such an ambiguity. Such language is not present in any of the policies

in question here. In its absence, Gerber has searched through the policies to find any word or clause which might be susceptible to different meanings in an effort to demonstrate that there is an ambiguity as to the scope of coverage.

■ Gerber's specific contentions are addressed below. However, the basic fallacy in its position lies in its general approach. Because it has ignored the fundamental principle, fully applicable to insurance policies, that a contract should be read as a whole so as to reflect the parties' intent, *see Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486, 488 (1985); *Chicago Insurance Co. v. Pacific Indemnity Co.,* 502 F.Supp. at 727, Gerber has, in effect, lost sight of the forest for the trees. Considered in their entirety, all of the subject policies clearly contemplate that the insurers are providing coverage which is over and above the limits of the insurance provided by Liberty Mutual and Mission National. That fact need not be repeated in every policy provision, and unless there is language present in the policy which affirmatively contradicts what was the parties' plain intent, close linguistic analysis is nothing more than sophistry.

### III.

It is with that principle in mind that the language of the different policies must be considered.

*Highlands Policy*

■ Gerber first points to Highlands' limits of liability provision as allegedly creating a material ambiguity. That provision contains a clause stating that "it is expressly agreed that liability shall attach to ... [Highlands] only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss." Gerber argues that "have been held liable to pay" must mean something different than "have paid," and that it can be read as referring

---

**1.** In any event, since this Court is ruling against Gerber, it has looked to Maryland law, which Gerber contends is applicable.

to a case where an underlying insurer has become insolvent. In the abstract, perhaps, the clause could have that meaning. In the context of an excess policy, however, it is merely an acknowledgement that attachment of Highland's liability need not wait for actual payment of the underlying amount.

Gerber next purports to find ambiguity in a provision in the Highlands' policy requiring Gerber to maintain its underlying insurance. That provision states, *inter alia,* that "if the first layer umbrella policy ceases to apply (for reasons other than exhaustion of an aggregate limit of liability) this policy likewise ceases to apply...." Gerber contends that the word "exhaustion" is ambiguous since it could mean exhaustion through insolvency of the underlying insurer. Gerber relies upon *Fageol Truck & Coach Co. v. Pacific Indemnity Co.,* 18 Cal.2d 748, 117 P.2d 669 (1941) to support this contention. *Fageol,* however, was decided on facts quite different from those present in the instant case. It involved an insurance policy that covered the seller of a truck when "all other specific insurance shall have been exhausted." The policy did not contain a schedule of underlying insurance, and the term "exhausted" was left unmodified. The Court characterizing the policy as one for indemnity and emphasized that "the very purpose of an agreement for indemnity is to make the indemnitee whole in event of the insolvency of the primary obligor." 117 P.2d at 671. Here, in contrast, nothing in the Highlands policy suggests that it is for indemnity, the policy specifically limited liability to situations where losses exceeded a sum certain, $26 million, and a phrase used in the Highlands' maintenance provision—"exhaustion of an aggregate limit of liability"—directly tied exhaustion to the triggering limit.

*AIU Policy*

The AIU policy contains a straight "follow form" which incorporates *in toto* the policy terms of the underlying Mission National policy and offers no substantive provisions of its own. Gerber asserts that there are three ambiguities in the Mission National provisions thus incorporated.

It first points to the limit of liability provision. That provision clearly limits liability to excess coverage over the limits of the underlying insurance and, in addressing the question of reduction or exhaustion of the underlying limits, expressly refers to "reduction or exhaustion of the aggregate limits of liability under said underlying insurance *by reason of losses paid thereunder.*" Since this language self-evidently does not include "reduction" or "exhaustion" caused by the insolvency of the underlying insurer, Gerber is required to make the argument that an ambiguity exists by virtue of the *omission* of any reference to insolvency. This argument falls of its own weight. The policy language is clear, and it does not become ambiguous simply because it does not cover a situation which Gerber would like it to cover. If Gerber wanted to expand the scope of coverage, it could have bargained for broader policy language to that effect.

The next provision in the Mission National policy which Gerber asserts creates an ambiguity is the maintenance of insurance provision. That provision, like the limit of liability provision, is said to be made ambiguous by omissions in it. The first omission is a reference to insolvency. That omission is as immaterial here as it is in regard to the limit of liability provision. The other omission is of the word "collectible" to modify the type of insurance which Gerber is required to maintain in full force and effect. If this were a case in which Mission National or AIU were relying upon the maintenance provision as the provision defining the scope of its coverage, Gerber's contention of ambiguity on this point might have merit. However, the scope of AIU's coverage is clearly defined elsewhere in the policy, and the maintenance provision creates no ambiguity as to what that coverage language means.

Gerber's final argument concerning the AIU policy focuses upon the defense, settlement and supplementary payment provision. Again, that provision is not the one which defines the scope of coverage. In any event, the provision creates no ambiguity. Gerber focuses upon a clause stating that "as respects occurrences covered under this policy, but not covered under the

underlying insurance as set out in the attached schedule or under any other collectible insurance, the company shall ... defend ... any suit against the Insured." Gerber argues that the words "covered" and "collectible" are ambiguous. However, no ambiguity is apparent. To the contrary, the inclusion of the word "collectible" to modify "other insurance" but not to modify "underlying insurance" logically implies that collectibility is relevant to the former but not to the latter. *See Radiator Specialty Co. v. First State Ins. Co.*, 651 F.Supp. at 441.

*American's Policy*

Gerber also points to three provisions in American's policy as creating ambiguity. Its argument concerning the maintenance of insurance provision is essentially the same argument of omission which it makes in regard to the AIU policy, and the argument fails for the same reasons previously stated.

■ Gerber's argument as to the limit of liability provision is based upon the clause "in the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall in the event of reduction, apply as excess of the reduced amount of liability thereunder...." Citing *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 506 N.E.2d 123 (1987), Gerber argues that the word "applicable" is ambiguous. *Gulezian* is not apposite. The Court there did not find anything inherently ambiguous about the word "applicable;" to the contrary, it began its analysis by stating that "the words 'applicable limits' are not ambiguous, viewing these words in isolation." The only ambiguity found by the Court arose from the fact that in the policy there under consideration "applicable" was used twice in the same sentence as "collectible," creating the possibility that the policy tended to equate "applicable" with "collectible." 506 N.E.2d at 125–26.

■ The final point of Gerber's attack upon American's policy is directed at the "payment of loss" provision. That provi-

sion states, *inter alia*, that "it is a condition of this policy that the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted." Gerber argues that the unmodified use of the word "exhausted" creates an ambiguity. If that word were contained in the provisions defining the scope of coverage, Gerber's argument might have merit. *Cf. Massachusetts Insurers Insolvency Fund v. Continental Cas. Co.*, 399 Mass. 598, 506 N.E.2d 118 (1987). Where, however, as here, "exhaust" is used in the payment provision, it clearly refers to the method of exhaustion defined elsewhere in the policy.

*Federal Policy*

Gerber returns to familiar ground in arguing that there are ambiguities in the Federal policy.

First, it contends that since the "insuring agreement" provision of the Federal policy uses the unmodified term "exhausted," it ambiguously suggests that "exhaustion" of the underlying insurance can be accomplished through the insolvency of the underlying insurer. Assuming that the word "exhaust" can be fairly read as having this meaning, Gerber's argument nevertheless fails because Federal's own insuring agreement is, by virtue of a "conflicting word endorsement," superceded by the limit of liability provision in Mission National's policy which is incorporated into Federal's policy. As discussed in connection with AIU's policy, *supra*, the Mission National limit of liability provision is not ambiguous.

Gerber next contends that there is ambiguity in the word "covered" in the Mission National defense and settlement provision incorporated into the Federal policy. Again, it must be remembered that a defense and settlement provision does not define the scope of coverage. In any event, there is no greater ambiguity in the word "covered" here than in the AIU policy. It simply refers to a category of insurance coverage, not a collectible amount.

The last provision to which Gerber points in striving to find an ambiguity in the Federal policy is the maintenance of insurance provision. It is not clear whether the governing provision is Federal's own provi-

sion or Mission National's provision which is incorporated by reference into the Federal policy. Because of the conflicting word endorsement, it appears to be the latter. In any event, the two provisions are substantially the same, and Gerber can only repeat the argument, rejected above, that there are material "omissions" in them.

A separate order granting defendants' motions for summary judgment is being entered herewith.

### ORDER

For the reasons stated in the memorandum entered herein, it is this 14th day of November 1988

ORDERED

1. The motions for summary judgment filed by Highlands Insurance Company, AIU Insurance Company, American Insurance Company and Federal Insurance Company are granted; and

2. Judgment is entered in favor of Highlands Insurance Company, AIU Insurance Company, American Insurance Company and Federal Insurance Company against plaintiff.