INTERCO INCORPORATED, Appellant,

v.

NATIONAL SURETY CORPORATION;
Federal Insurance Company,
Appellees.

No. 89–1607.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1989.
Decided April 13, 1990.

Lynn Chipperfield, St. Louis, Mo., for appellant.

Robyn Griefzu Fox, Charles E. Reis, IV, St. Louis, Mo., for appellees.

Before ARNOLD and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.

MAGILL, Circuit Judge.

Appellant, Interco Incorporated (Interco), brought a declaratory judgment action to

determine the liability of second- and third-tier excess liability carriers as a result of the insolvency of a first-tier excess carrier. Appellee, National Surety Corporation (National), moved to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted, and Interco moved for summary judgment, pursuant to Fed.R.Civ.P. 56, against National. The district court[1] found that neither National nor Federal Insurance Company (Federal) was obligated to pay any loss within the policy limits of the insolvent first-tier excess carrier and granted National's Rule 12(b)(6) motion to dismiss after converting it, pursuant to Fed.R.Civ.P. 12(b)(6), into a summary judgment motion. Interco's motion for summary judgment was denied. Finally, the district court granted summary judgment *sua sponte* and entered judgment in favor of Federal. We affirm.

## I. FACTS

In 1984 Interco maintained $100 million in blanket excess public liability insurance coverage spread among three carriers.[2] Mission Insurance Company (Mission), the first-tier excess liability carrier, became insolvent on February 24, 1987. Mission would have been liable for $450,841 in excess liability incurred by Interco in 1987.[3] Interco requested that the district court interpret the operative language in the second-tier excess liability policy (the National policy) and the third-tier excess liability policy (the Federal policy) to determine whether "drop down" was triggered by the insolvency of Mission.

### A. The National Policy Language

The National policy provided $40 million in excess coverage "[t]o indemnify the Insured for the Insured's ultimate net loss *in excess of the insurance afforded* under the Blanket Excess Liability or 'Umbrella' policies specified in Item 7 of the Declarations (the Mission policy), hereafter called underlying insurance," for an annual minimum premium of $12,000. Blanket Excess Liability Policy, dated March 8, 1984, between Interco and National, Insuring Agreement 1, as amended (emphasis and parenthetical added) (hereinafter referred to as the National coverage clause). The scope of coverage was limited under the terms of the policy, in that

> [t]he Company shall be liable only for the limit of liability stated in Item 3 of the Declarations ($40 million) *in excess of the limit or limits of liability of the applicable underlying insurance policy or policies* (Item 4: $30 million) all as stated in the declarations of this policy.... provided, however, in the event of reduction or exhaustion of the applicable aggregate limit or [sic] limits of liability under said underlying policy or policies *solely by reason of losses paid thereunder* on account of occurrences during this policy period, this policy shall in the event of reduction, apply as excess of the reduced limit of liability thereunder.

*Id.* at Insuring Agreement 2, as amended (emphasis and parentheticals added) (hereinafter referred to as the National limit of liability clause). In addition, Condition 1 of the National policy, entitled "Maintenance of Primary Insurance," provided in pertinent part that Interco, the insured, warranted that it would maintain the scheduled underlying insurance

> ... *except for reduction of aggregate limits solely as a result of payment of claims* arising out of occurrences during this policy period. If such underlying insurance is not maintained in full effect

---

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

2. Interco's insurance carriers were as follows:

| Tier | Insurance | Premium | Coverage |
|------|-----------|---------|----------|
| Primary | | | $500,000 |
| 1 | Mission | $27,000 | $30 million |
| 2 | National | $12,000 | $40 million |
| 3 | Federal | $ 7,500 | $30 million |

3. Interco settled a lawsuit for $779,797, and recovered $500,000 from its primary carrier. The remaining $279,797 was payable by Mission as Interco's first-tier excess liability carrier. On June 19, 1987, Interco obtained an unrelated judgment against Mission for $147,639, payable under the first-tier excess liability policy. On or about May 1, 1987, Interco paid a judgment of $23,405 recoverable under the Mission policy.

by the Insured *or if there is any change in the scope of coverage under any underlying insurance, the insurance afforded by this policy shall apply in the same manner as though such underlying policies had been so maintained and unchanged.*

*Id.* at Conditions 1 (emphasis added) (hereinafter referred to as the National maintenance clause).

### B. The Federal Policy Language

The Federal policy provided $30 million in third-tier excess liability coverage and provided that:

> In consideration of the payment of the required premium [$7,500] and subject to all the terms of this policy, the Company agrees to pay on behalf of the insured LOSS resulting from any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE policy scheduled in Item 6 of the Declarations [the Mission policy] (except for the Limits of Liability and defense provisions, if any). The insurance *afforded by* this policy shall apply only in excess of and after all UNDERLYING INSURANCE [the National policy] (as scheduled in Item 6 of the Declarations) has been *exhausted.*

Excess Liability Policy, dated March 6, 1984, between Interco and Federal, Policy Provisions, Insuring Agreement 1 (emphasis and brackets added) (hereinafter referred to as the Federal coverage clause). The Federal policy explicitly provided for "drop down"

> *[i]n the event of reduction or exhaustion* of the aggregate limit or limits designated in the underlying policy or policies *solely by payment of losses* in respect to (accidents) or (occurrences) during the period of such underlying policy or policies, it is hereby understood and agreed that such *insurance* as is *afforded* by this policy *shall apply in excess of the reduced underlying limit or, if such limit is exhausted, shall apply as underlying insurance,* notwithstanding anything to the contrary in the terms and conditions of this policy.

*Id.* at Endorsement 3 (emphasis added) (hereinafter referred to as the Federal endorsement clause). Like the National policy, the Federal policy included a maintenance of underlying insurance clause which provided that:

> [T]he Insured agrees that the First UNDERLYING INSURANCE policy, and other UNDERLYING INSURANCE following the terms and provisions of the First UNDERLYING INSURANCE policy (except for limit of liability and defense provisions, if any), shall be maintained in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of occurrences happening during the period of this policy. The failure of the Insured to comply with the foregoing shall not invalidate this policy but in the event of such failure the Company shall only be liable to the same extent as if the Insured had complied with this condition.

*Id.* at Policy Provisions, Maintenance of Underlying Insurance 5 (hereinafter referred to as the Federal maintenance clause).

### II. DISCUSSION

■■■ Interco requested that the district court interpret the National and Federal policy language to ascertain the potential obligations of its second- and third-tier excess liability carriers as a result of the insolvency of its first-tier excess liability carrier. State law is controlling regarding the rules for construction of insurance contracts. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Insurance contracts must be construed to afford plain meaning to unambiguous language and read ambiguous terms against the insurer. *Fremont Indem. v. Lawton–Byrne–Bruner Ins. Agency Co.,* 701 S.W.2d 737 (Mo.App.1985). Under Missouri law, an allegedly ambiguous phrase must be considered in the context of the policy as a whole. *Nixon v. Life Investors Ins. Co.,* 675 S.W.2d 676 (Mo.App.1984). Ambiguity exists in an insurance contract if duplicity, indistinctness or uncertainty of meaning is evident. *Id.* For example, if

there is doubt or uncertainty regarding the meaning of policy language and the language is fairly susceptible to two interpretations, then the language is ambiguous.

### A. National Policy Coverage

■ Interco takes issue on appeal with the district court's conclusion that the National policy language in the coverage clause, "in excess of the insurance *afforded* ..." (under the Mission policy) (emphasis added), was unambiguous as a matter of law. Interco contends that the policy language, specifically the word "afforded," is susceptible to two reasonable interpretations. Interco believes the clause could be fairly and reasonably interpreted to cover insolvency because the use of the term "afforded" could indicate an agreement by National to pay in excess of insurance payments actually furnished. Interco theorizes that since Mission was insolvent, it was incapable of making payments to satisfy its excess liability. Therefore, Mission "afforded" zero insurance and National should drop down and incur liability for any excess liability incurred by Mission.

In *United States Fire Ins. Co. v. Coleman*, 754 S.W.2d 941 (Mo.App.1988), the Missouri court of appeals considered the following coverage clause:

> [T]he company's liability shall be only for the ultimate net loss *in excess* of the insured's retained limit defined as ...
>
> > (a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any *other insurance collectible* by the insured; ...

and concluded that "collectible" could only reasonably be interpreted to modify "any other insurance," and not "the underlying policies" indicating a drop down obligation. The National coverage clause exhibited even less of a potential for ambiguity. There is no indication that "afforded" could reasonably mean anything but "covered."

Interco attempts to distinguish *Coleman* by classifying it as a case where coverage was restricted to amounts in excess of specific dollar amounts. Appellant cites the fact that the National and Federal policies indicate no amount certain as a minimum threshold for coverage. However, the National clause required indemnification for losses "in excess of the insurance afforded" under specific umbrella policies incorporated by reference. In addition, the limit of liability clause tied coverage to the specific underlying limits of the Mission policy. Finally, the "not recoverable" or analogous language, like that considered in *Coleman*, was omitted. Therefore, no specific intent existed to provide for coverage in the event of the insolvency of an underlying insurer.

There is a difference between the fact of coverage and the extent of coverage. *Garmany v. Mission Ins. Co.*, 785 F.2d 941 (11th Cir.1986). Excess coverage is liability that attaches only after a predetermined amount of primary coverage is exhausted. Ordinarily, excess insurers are not deemed to have provided drop down coverage in the event of an underlying insurer's insolvency. *Highlands Ins. Co. v. Gerber Prods. Co.*, 702 F.Supp. 109 (D.Md.1988). Therefore, we must examine the triggering language in the excess policies to determine whether the excess insurer could reasonably be said to have insured against the insolvency of the underlying insurer.[4]

■ If an excess insurance policy requires the excess insurer to indemnify the insured for losses in excess of the amount specified in an underlying policy, the insolvency of the underlying insurer should not create a lower minimum threshold triggering liability on the part of the excess insurer. In *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir. 1986), the court of appeals held that the insolvency of the primary insurer did not render the primary insurance "inapplicable."

4.  See, e.g., *Transco Exploration Co. v. Pacific Employers Ins. Co.*, 869 F.2d 862 (5th Cir.1989); *Molina v. United States Fire Ins. Co.*, 574 F.2d 1176 (4th Cir.1978); *Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122 (7th Cir.1987); *Rapid City Regional Hosp., Inc. v. South Dakota Ins. Guar. Ass'n*, 436 N.W.2d 565 (S.D.1989); *Seaway Port Auth. of Duluth v. Midland Ins. Co.*, 430 N.W.2d 242 (Minn.Ct.App.1988).

Construing the National policy to require indemnification would essentially make the policy a guaranty of the solvency of Mission. Excess policies are intended to provide low cost coverage for catastrophic losses beyond the bounds of ordinary primary limits, and the insurer must be able to ascertain the point at which its liability will attach in order to evaluate the insurable risk and its cost of coverage. *Fried v. North River Ins. Co.*, 710 F.2d 1022 (4th Cir.1983). We should not construe a policy to subject the insurer to unforeseeable and variable risks. Therefore, the National coverage clause should not be read to create an obligation to pay losses within the policy limits of the insolvent underlying insurer.

Appellant interprets Insuring Agreement 2, which indicates that underlying insurance must be "exhausted," to require that underlying coverage be unavailable for payment for any reason whatsoever. This interpretation is contrary to the plain meaning of the National limit of liability clause. The clause provides for drop down in the event of exhaustion "solely by reason of losses paid." The limit of liability clause must be read in conjunction with the National maintenance clause which precludes drop down in other instances. An instance of insolvency would be governed by the maintenance clause. It is clear that the parties intended "exhaustion" to mean payment and not insolvency. Therefore, the insolvency of an underlying carrier like Mission does not constitute exhaustion of underlying insurance within the meaning of the National policy triggering drop down.

A federal district court in Maryland has considered the issue of whether second-tier excess insurers were required to drop down when the first-tier excess insurer became insolvent. *Highlands*, 702 F.Supp. 109. The *Highlands* court interpreted four standard second-tier excess liability policies and granted summary judgment to the second-tier excess insurers because (1) the policies specifically limited liability to situations where losses exceeded a sum certain, (2) the maintenance provisions directly tied exhaustion to the triggering limit, and (3) the limit of liability provisions clearly indicated

that excess liability would apply only in addition to the limits of the underlying insurance and addressed reduction or exhaustion by expressly referring to "losses paid thereunder." The *Highlands* court considered the same language that Interco requested the district court to interpret. We believe the analysis employed by the *Highlands* court in interpreting each policy as a whole to determine potential ambiguity was sound. When we interpret the National policy as a whole, we are compelled to conclude that the district court did not err in finding that the policy was unambiguous as a matter of law.

### B. Federal Policy Coverage

The Federal coverage clause states that "insurance *afforded by* this policy shall apply *only* in excess of and after all UNDERLYING INSURANCE ... has been *exhausted*" (emphasis added). The Federal endorsement clause indicates that Federal coverage would only be triggered by the exhaustion of underlying insurance through the payment of claims. A similar clause was interpreted by the Seventh Circuit to mean that an excess insurer will only drop down "when exhaustion occurs by reason of losses paid under the policy." *Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1126 (7th Cir.1987) (citing *Mission Nat'l. Ins. Co. v. Duke Transp. Co.*, 792 F.2d 550, 553 (5th Cir.1986)).

Further analysis involving the Federal maintenance clause leaves no question that drop down was precluded. The clause provides that if Interco failed to maintain underlying insurance, by reason other than payment of claims, the excess insurers would be liable to the same extent as if the underlying insurance had been maintained. Read as a whole, the Federal policy prevented drop down to cover a reduced limit by reason of insolvency of the underlying insurer.

### C. Summary Judgment *Sua Sponte*

■ Appellant argues on appeal that the district court's *sua sponte* grant of summary judgment in favor of Federal was im-

proper. Interco claims that the lack of notice, analysis, briefing or argument regarding the language of the Federal policy precluded a grant of summary judgment in the absence of a motion by a party. Citing differences in policy language between the National and Federal policies, Interco contends that the Federal policy presented separate issues for interpretation.

A federal district court may grant summary judgment, pursuant to Fed.R.Civ.P. 56, *sua sponte*, provided that the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted. 10A C.A. Wright, A.R. Miller & M.K. Kane, *Federal Practice and Procedure* § 2720, p. 27 (2d ed. 1983). The granting of summary judgment *sua sponte* is consistent with the expeditious disposition of cases, a primary objective of Rule 56.

Federal correctly contends that the district court properly granted summary judgment. The issue on which judgment was granted, that no genuine issue of material fact as to an excess liability insurer's obligation to drop down and afford coverage provided by an insolvent underlying insurer existed, was presented and argued by Interco. Interco brought the original action requesting declaratory relief from the district court. In addition, in response to National's motion to dismiss, Interco alternatively moved for summary judgment against National. In its motion, Interco asserted that no genuine issue of material fact existed and that the only issue was the interpretation of policy language, a question of law for the court. The district court reasonably applied this assertion to Interco's claim against Federal and properly granted summary judgment *sua sponte* in favor of Federal.

Federal also asserts that Interco had no basis for a claim after summary judgment was granted in favor of National, and therefore the district court's grant of summary judgment *sua sponte* in favor of Federal was proper. *See Union Nat'l Bank of Little Rock v. F.N.M.A.*, 860 F.2d 847 (8th Cir.1988). Any obligation on the part of Federal to drop down would be contingent upon the finding of such liability on the part of National. Therefore, the district court was correct in granting summary judgment on a claim dependency theory.

We have consistently required strict compliance with the Rule 56 motion, opportunity for service of opposing affidavits, and hearing requirements. *See, e.g., Williams v. City of St. Louis*, 783 F.2d 114 (8th Cir.1986); *Denton v. Mr. Swiss of Missouri, Inc.*, 564 F.2d 236 (8th Cir.1977); *Twin City Fed. Savs. & Loan Ass'n v. Transamerica Ins. Co.*, 491 F.2d 1122 (8th Cir.1974). Our concern in the above-mentioned cases was a district court's tendency to engage in issue determination rather than issue identification, when granting summary judgment *sua sponte*. However, in the instant case there was no genuine issue of material fact as to Federal's potential drop down obligation because summary judgment was granted to National from whom Federal's liability would have been derived. In granting summary judgment in favor of Federal, the district court did not posit an issue and proceed to determine it, but rather properly concluded that no genuine issue of material fact existed.

## CONCLUSION

We believe the district court properly found that the National second-tier and the Federal third-tier excess liability policies were unambiguous as a matter of law in precluding drop down coverage in the event of the insolvency of Mission, the first-tier excess liability carrier. No genuine issue of material fact existed regarding coverage. Therefore, we affirm the district court's granting of summary judgment in favor of National pursuant to motion and Federal *sua sponte*.