**Sheila D. HENDRIX, Administratrix of the Estate of Gary W. Hendrix, Deceased, Appellant,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Appellee.**

No. 90–CA–001696–MR.

Court of Appeals of Kentucky.

Oct. 4, 1991.

Discretionary Review Denied by Supreme Court March 4, 1992.

Fred E. Fischer, Louisville, for appellant.

Harry K. Herren and Susan R.H. Gernert, Woodward, Hobson & Fulton, Louisville, for appellee.

Before EMBERTON, HUDDLESTON and WILHOIT, JJ.

HUDDLESTON, Judge.

Sheila D. Hendrix, administratrix of the estate of her late husband, Gary W. Hendrix, appeals from a summary judgment which declared that Fireman's Fund Insurance Company, the issuer of a blanket excess liability policy providing coverage for claims in excess of $5,500,000.00, is not required to "drop down" and pay a $1,000,000.00 settlement which would have been assessed against a first level excess carrier but for its insolvency. Because we believe that the trial court ruled correctly, we affirm its judgment.

The facts are not in dispute. In 1985, Gary W. Hendrix was killed while operating an aerial lift device manufactured by TECO, Inc. The Hendrix estate's wrongful death action was settled for $1,500,000.00, $500,000.00 of which was paid by TECO's primary carrier, United States Fidelity & Guarantee Company. As part of the settlement, TECO assigned to the Hendrix estate any potential right and/or interest, up to $1,000,000.00, that it had in the proceeds of a blanket excess liability policy issued by Fireman's Fund.

TECO had a multi-layered insurance program in which USF & G provided primary liability coverage up to $500,000.00. The intermediate layer of coverage—from $500,000.00 to $5,500,000.00—was provided by Integrity Insurance Company; and liability coverage in excess of that amount was provided by Fireman's Fund. At the time of TECO's settlement with the Hendrix estate, Integrity was insolvent, thus creating a $5,000,000.00 gap in coverage.

Hendrix' administratrix, as TECO's assignee, filed a declaration of rights action, according to the procedure outlined in KRS 418.040 et seq., asserting that, due to Integrity's insolvency, Fireman's Fund should be required to "drop down" to Integrity's layer of coverage and pay the additional $1,000,000.00 due under the terms of the settlement with TECO. When the trial court, in a well-written opinion, ruled otherwise, she appealed to this Court.

■ Initially, Hendrix' administratrix contends that the policy issued by Fireman's Fund, construed most favorably to the insured, provides "drop down" coverage. It is true, as she argues, that in this state doubts concerning the meaning of contracts of insurance are resolved in favor of the insured. *State Auto. Mutual Ins. Co. v. Ellis,* Ky.App., 700 S.W.2d 801, 803 (1985). But, in the absence of ambiguities or of a statute to the contrary, the terms of an insurance policy will be enforced as drawn. *Osborne v. Unigard Indemnity Co.,* Ky.App., 719 S.W.2d 737, 740 (1986); *Woodard v. Calvert Fire Ins. Co.,* Ky., 239 S.W.2d 267, 269 (1951). Unless the terms contained in an insurance policy have acquired a technical meaning in law, they "must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured." *Fryman v. Pilot Life Ins. Co.,* Ky., 704 S.W.2d 205, 206 (1986). Although restrictive interpretation of a standardized adhesion contract is not favored, neither is it the function of the courts to make a new contract for the parties to an insurance contract. *Moore v. Commonwealth Life Ins. Co.,* Ky.App., 759 S.W.2d 598, 599 (1988). Under the "doctrine of reasonable expectations," an insured is entitled to all the coverage he may reasonably expect to be provided according to the terms of the policy. *Woodson v. Manhattan Life Ins. Co.,* Ky., 743 S.W.2d 835, 839 (1987).

■ With these generally-accepted rules of construction in mind, we look to the

contractual terms of the Fireman's Fund blanket excess liability policy which are alleged to support coverage. In reviewing them, it will be observed that the problem created by an insolvent intermediate excess carrier is not explicitly addressed.

## INSURING AGREEMENTS

1. Coverage. To indemnify the Insured for the Insured's ultimate net loss *in excess of the insurance afforded under the Blanket Excess Liability or "Umbrella" policies* specified in Item 7 of the Declarations, hereafter called underlying insurance ... [Integrity policy No. ISX119599].

2. Limit of Liability. The Company shall be liable only for the limit of liability stated in Item 3 of the Declarations *in excess of the limit or limits of liability of the applicable underlying insurance policy or policies* [$5,000,000.00] all as stated in the declarations of this policy. The limit of the liability stated in the declarations as applicable to "each occurrence" shall be the total limit of the Company's liability for all damages sustained as the result of any one occurrence, provided, however, *in the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences during this policy period, this policy shall* in the event of reduction, *apply as excess of the reduced limit* of liability thereunder....

## CONDITIONS

1. Maintenance of Primary Insurance. The Insured warrants and it is a condition of this policy, that at the inception of this policy, insurance afforded by the underlying policies of insurance (applying as excess over various policies of primary insurance) with combined limits of liability for said underlying insurance stated in Item 4 of the declarations or renewals or replacements thereof not affording coverages other than those at inception of this policy, shall be maintained in full effect during the period of this policy, except for reduction of aggregate limits solely as a result of payment of claims arising out of occurrences during this policy period. *If such underlying insurance is not maintained in full effect by the insured or if there is any change in the scope of coverage under any underlying insurance, the insurance afforded by this policy shall apply in the same manner as though such underlying policies had been so maintained and unchanged.* (Emphasis supplied.)

A number of courts have considered issues similar to those raised in this case. One of the cases which closely approximates this one is *Highlands Ins. Co. v. Gerber Products Co.*, 702 F.Supp. 109 (D.Md.1988), where the contract language construed was virtually identical to that found in the Fireman's Fund policy here under consideration. Noting that the policies in question clearly state that they are providing excess coverage, the District Court observed:

In its ordinary usage, the word "excess" means "over and above;" it does not mean "down into." Thus, excess carriers ordinarily are not required to provide drop-down coverage in the event of the insolvency of an underlying insurer. [Citation omitted.] An exception to this general rule exists only where an insurer has used language in its policy which creates a genuine ambiguity as to the scope of coverage. [Citations omitted.] Clauses indicating that the excess insurer will provide coverage over underlying "collectible" or "recoverable" insurance have been found to create such an ambiguity. Such language is not present in any of the policies in question here. *Id.* at 111–112.

In *Alabama Ins. Guarantee Ass'n. v. Kinder–Care, Inc.*, 551 So.2d 286 (Ala. 1989), the Court had before it a blanket excess liability policy issued by Fireman's Fund which in its essential parts is identical to the one under consideration in this case. In the Alabama case, Kinder–Care had contracted with Maryland Casualty Company for primary insurance with policy limits of $500,000.00. Kinder–Care's first level of excess coverage, with a limit of

$25,000,000.00, was provided by Mission Insurance Company and its second layer of excess coverage was provided by Fireman's Fund.

Following the $1.7 million settlement of a wrongful death action against it, Kinder-Care sought payment of the settlement amount from its insurers. Maryland Casualty paid its $500,000.00 policy limits, but Mission Insurance was unable to meet its obligation as it was insolvent. When Fireman's Fund refused to cover Mission's obligation, Kinder-Care sued seeking, amongst other relief, a declaration that Fireman's Fund was obliged under the terms of its policy to "drop down" and cover Mission's insolvency.

On appeal from a summary judgment in favor of Fireman's Fund, the Alabama Supreme Court was confronted with the argument that the policy under consideration was ambiguous and thus required to be construed in favor of the insured. Rejecting that argument, the Court adopted the language of the trial court which held as follows:

As a matter of law the language of the excess liability insurance contract between ... Fireman's Fund Insurance Company and ... Kinder-Care, Inc., is clear and unambiguous as to the obligations of [Fireman's Fund] under the contract. Paragraph two of the "Insuring Agreements" makes it abundantly clear that [Fireman's Fund] is obligated to pay a claim only "in the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies *solely by reason of losses paid thereunder* on account of occurrences during this policy period." This language cannot be reasonably interpreted to mean that [Fireman's Fund] was contracting to insure the insolvency of the underlying carrier, Mission Insurance Company, but rather [Fireman's Fund] was agreeing to pay claims in excess of the amounts paid according to the limits of the underlying policy.... *Id.* at 288.

It is also clear that under the "Conditions" section of the Fireman's Fund policy

it was the duty of the insured, TECO, to maintain collectable underlying coverage in force: "... the insurance afforded by this policy shall apply in the same manner as though such underlying policies had been so maintained and unchanged." In *Zurich Ins. Co. v. The Heil Co.*, 815 F.2d 1122 (7th Cir.1987), the United States Court of Appeals for the Seventh Circuit interpreted a similar policy provision as placing the burden on the policyholder to obtain and maintain primary and secondary coverage.

Hendrix maintains that the Fireman's Fund policy contains inconsistent and ambiguous language. Specifically, she argues that the provision of the "Coverage" section in which Fireman's Fund agrees to indemnify the insured for its "ultimate net loss in excess of the insurance afforded" by the underlying policies is inconsistent with the provision in the "Limit of Liability" section which limits coverage to amounts "in excess of the limit or limits of liability of the applicable underlying insurance policy." She contends that since the underlying insurer, Integrity, is insolvent, the insurance "afforded" is less than the "limit or limits of liability."

In *Interco, Inc. v. National Surety Corp.*, 900 F.2d 1264 (8th Cir., 1990), the insured, as here, sought a declaratory judgment that "drop down" coverage was required to fill the gap left by an insolvent insurer. The policy contained language like that used in the TECO policy. The court held that the language was unambiguous and that there was no indication that "afforded" meant anything other than "covered." The court recognized the rule that ordinarily excess insurers are not deemed to provide "drop down" coverage:

If an excess insurance policy requires the excess insurer to indemnify the insured for losses in excess of the amount specified in an underlying policy, the insolvency of the underlying insurer should not create a lower minimum threshold triggering liability on the part of the excess insurer. In *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir.1986), the court of appeals held that the insolvency of the

primary insurer did not render the primary insurance "inapplicable."

Construing the National policy to require indemnification would essentially make the policy a guaranty of the solvency of Mission. Excess policies are intended to provide low cost coverage for catastrophic losses beyond the bounds of ordinary primary limits, and the insurer must be able to ascertain the point at which its liability will attach in order to evaluate the insurable risk and its cost of coverage. *Fried v. North River Ins. Co.,* 710 F.2d 1022 (4th Cir.1983). We should not construe a policy to subject the insurer to unforeseeable and variable risks. Therefore, the National coverage clause should not be read to create an obligation to pay losses within the policy limits of the insolvent underlying insurer. *Id.* at 1267.

See also *Alabama Ins. Guarantee Ass'n. v. Kinder–Care, Inc., supra,* similarly construing language identical to that which was contained in the TECO policy.

■ Hendrix next argues that under the doctrine of "reasonable expectations," TECO was entitled to reasonably expect that Fireman's Fund would fill in any gap created by insolvency. Such an interpretation would require insurance companies to continuously scrutinize each other's financial stability. We agree with the trial court in that "the very nature of an excess liability policy is such that the limits of the underlying policies must be paid before liability attaches. Furthermore, excess policies are sold at moderate prices to pick up where the underlying coverages end. Is it reasonable for the insured to expect the insurer to accept a risk that was not bargained or paid for?"

Hendrix further argues that the trial court misapplied the policy's "Maintenance of Primary Insurance" clause by placing an "onerous" burden on an insured to continuously determine the solvency of its carrier. On the other hand, "imposing the duty of indemnification on [an excess liability insurer] would, in effect, transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured

might choose." *Continental Marble & Granite v. Canal Ins. Co.,* 785 F.2d 1258, 1259 (5th Cir.1986). A court may not read into an insurance policy terms and conditions which it does not contain. *Burk v. U.S. Aviation Underwriters, Inc.,* 763 F.2d 224 (6th Cir.1985).

Finally, Hendrix relies on a public policy argument that as between the insured and an insurance company, the latter should bear the loss and be responsible for scrutinizing other insurance companies which have provided underlying coverage. We do not find her position persuasive; her authorities are inapposite. The parties to a private agreement may allocate risks in any manner they choose, absent a violation of law. *Reserve Ins. Co. v. Pisciotta,* 180 Cal.Rptr. 628, 30 Cal.3d 800, 640 P.2d 764 (1982). In this case, the insurance contract which the parties agreed to unquestionably assigns to the insured the duty to maintain in force underlying insurance in the specified amount with a solvent insurance carrier or carriers.

The summary judgment granted by Jefferson Circuit Court in favor of Fireman's Fund is affirmed.