Gale HORNBACK and Gwen
Hornback, Appellants,

v.

BANKERS LIFE INSURANCE COM-
PANY; Alex Montgomery, Inc.; and
Rebecca Lynn Garrett, Appellees.

No. 2004–CA–001724–MR.

Court of Appeals of Kentucky.

Nov. 4, 2005.

Matthew C. Hess, Elizabethtown, KY, for Appellants.

David A. Nunery, Campbellsville, KY, for Appellee, Bankers Life.

Peter B. Jurs, Cincinnati, OH, for appellees, Alex Montgomery, Inc. and Rebecca Lynn Garrett.

Before BUCKINGHAM, DYCHE, and TAYLOR, Judges.

## OPINION

BUCKINGHAM, Judge.

Gale and Gwen Hornback appeal from a summary judgment granted by the Taylor Circuit Court in favor of Bankers Life Insurance Company; Alex Montgomery, Inc. (AMI); and Rebecca Lynn Garrett. We affirm.

On June 22, 2000, the Hornbacks purchased a Dodge pickup truck from a dealership owned and operated by AMI. As part of the transaction, an employee of AMI, Rebecca Lynn Garrett, sold the Hornbacks a credit life and disability insurance policy. The cost of this insurance, $4,644.01, was included in the vehicle financing. As a result, the premiums were paid in full at the time of the transaction.

When Gale Hornback was diagnosed as having congestive heart failure in January 2002, the Hornbacks applied for the disability coverage under their policy. Bankers Life denied coverage and rescinded the policy. It took this action after learning the answers submitted by the Hornbacks on the insurance application did not accurately reflect Gale's past medical history. In response, the Hornbacks filed a civil complaint in the Taylor Circuit Court against Bankers Life, AMI, and Garrett.

Under the Eligibility Statement of the application of insurance, there was a provision which stated that "PRE–EXISTING CONDITIONS ARE EXCLUDED." Further, the application required the Hornbacks to answer the following question:

In the past 60 months, have you been treated for or diagnosed as having any of the following: stroke, cancer, any disease of the heart, lungs, kidneys, liver or digestive system, insulin dependent diabetes, chemical dependency or mental or nervous disorder?

The Hornbacks responded to the question by checking the box "NO." In addition, the application stated that the applicant was not eligible for coverage if he or she had answered "YES" to that or two other questions.

Gale had suffered a heart attack in 1994. While the heart attack fell outside the 60–month window, his subsequent care did not. From the date of his heart attack, Gale utilized various medications to control his heart condition. Despite the use of medication and monitoring with his car-

diologist, Gale experienced chest pains severe enough to cause him to seek medical attention in the emergency room more than once during the 60–month period prior to his application for insurance. As a result of his ongoing problems, Gale underwent various procedures intended to assess the condition of his heart. This included several heart catheterizations and at least one thallium test. After being hospitalized with chest pains in August 1995, Gale was diagnosed as having multivascular coronary artery disease.

Despite full knowledge of the above facts, the Hornbacks' application for insurance makes no mention of the above information. They attempt to explain this by pointing to the circumstances under which the application was made. They note that Garrett, an employee of AMI and an agent of the insurer, reviewed the application with them. Garrett read the questions and completed the application based on the answers they supplied. After completing the application, Garrett asked the Hornbacks to sign it. They testified that they were hurried and did not read the application before signing it. Despite these claims, they acknowledge that no one prevented them from either reading the form or filling out the answers themselves.

The Hornbacks testified that they disclosed the medical care Gale had received to Garrett. They claim they told her that Gale had suffered a heart attack in 1994, that he had suffered from chest pains and shortness of breath in the past 60 months, and that he had received checkups since his heart attack. In addition, both of the Hornbacks testified that, in their opinion, Gale had not been diagnosed or treated for disease of the heart.

Garrett testified that she had no independent recollection of what was said during her conversation with the Hornbacks. However, she testified that she read the questions on the application as they were written. Further, Garrett testified that she did not attempt to explain or define the terms used in the application.

In January 2002, Gale again sought treatment for chest pains and shortness of breath. On this occasion, he was diagnosed with congestive heart failure. Based on this diagnosis, the Hornbacks sought disability coverage under their insurance policy with Bankers Life. Upon receiving the Hornbacks claim for disability coverage, Bankers Life obtained Gale's medical records for the 60–month period prior to his application for insurance. Upon discovering the discrepancies between the Hornbacks' application and Gale's actual medical history, Bankers Life denied coverage and rescinded the policy.

As a result of Bankers Life's actions, the Hornbacks filed a civil complaint in the Taylor Circuit Court. They sought performance under the policy. In addition, they raised claims of negligence and breach of fiduciary duty against Garrett. AMI, as Garrett's employer, was named as having vicarious liability for her actions.

Following discovery, Bankers Life, AMI, and Garrett moved the court to award them summary judgment. They argued that the Hornbacks made material misrepresentations on the application. The Hornbacks countered that they did not make any misrepresentations, that the Eligibility Statement was ambiguous and unenforceable, and that the Eligibility Statement conflicts with the definition of pre-existing medical condition defined in the application. The court granted summary judgment to Bankers Life, AMI, and Garrett. This appeal by the Hornbacks followed.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[1] 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991). "The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996). "There is no requirement that the appellate court defer to the trial court since factual findings are not at issue." *Id.*

KRS[2] 304.14–110 relates to representations in applications for insurance and states in its entirety as follows:

All statements and descriptions in any application for an insurance policy or annuity contract, by or on behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise. This subsection shall not apply to applications taken for workers' compensation insurance coverage.

■ The Hornbacks' first argument is that the Eligibility Statement in the application is ambiguous because of the use of broad, undefined terms that conflict with the specific definition of "pre-existing medical condition" on the second page of the application. As noted earlier herein, the first question asked of the applicant on page one of the application was whether the applicant had been treated or diagnosed for, among other things, "any disease of the heart." The Hornbacks argue that the terms "treated," "diagnosed," and "disease" are ambiguous operative terms that were not defined in the application.

Further, they argue that the definition of "pre-existing medical condition" on page two of the application is more specific than the language in the first question on the first page and, therefore, that it governs. The Hornbacks reason that the definition of "pre-existing medical condition" actually compels coverage. They assert that Gale was treated and diagnosed for his heart condition prior to the 60–month period. They thus conclude that he did not have a "pre-existing medical condition" as that term was defined in the application.

In response, Bankers Life argues that had full disclosure occurred in response to the first question on the first page, they would not have issued a policy at all. As a result, Bankers Life maintains that the wording on page two does not come into play. We agree.

---

**1.** Kentucky Rules of Civil Procedure.

**2.** Kentucky Revised Statutes.

The language on the first page of the application clearly states that if the answer to the aforementioned question is "YES," then the applicant is not eligible for credit life or credit disability insurance coverage. Also, the question does not focus on pre-existing conditions. Rather, it specifically asks the applicant if he or she has been treated or diagnosed in the past 60 months for any of several conditions, including "any disease of the heart."[3] Thus, the simple issue is whether this question is ambiguous.

Gale suffered a heart attack in 1994. While the heart attack fell outside the 60–month window, his subsequent care did not. From the date of his heart attack, Gale utilized various medications to control his heart condition, including nitroglycerine tablets that he has carried since 1994. Throughout the period, Gale kept periodic appointments with his cardiologist. Despite this use of medication and monitoring, at various times throughout the 60–month period, Gale experienced chest pains severe enough to cause him to seek medical attention in the emergency room. As a result of his ongoing heart problems, Gale underwent various procedures intended to assess the condition of his heart, including several heart catheterizations and at least one thallium test.

In *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.*, 870 S.W.2d 223 (Ky.1994), the court stated that "the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *Id.* at 226. Further, in *Hendrix v.*

*Fireman's Fund Ins. Co.*, 823 S.W.2d 937 (Ky.App.1991), the court stated:

> Unless the terms contained in an insurance policy have acquired a technical meaning in law, they "must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured." (Citation omitted.)

*Id.* at 938. Considering these principles, we conclude that the aforementioned facts fall within the plain meaning of having "been treated for or diagnosed as having ... any disease of the heart." Thus, we reject the Hornbacks' claim that the question in the application is ambiguous. Further, for this reason, we reject the Hornbacks' claim that they are entitled to coverage based on the doctrine of reasonable expectations. *See Woodson v. Manhattan Life Ins. Co. of New York*, 743 S.W.2d 835, 839 (Ky.1987).

■ The Hornbacks' second argument is that the disclosures they made to Garrett concerning Gale's heart condition create genuine issues of material fact as to whether they misrepresented the information contained on the application. The Hornbacks testified that they related Gale's previous heart problems to Garrett at the time she completed the application. They further testified that they thought Gale's previous treatment for a heart attack in 1994 was treatment of a heart condition. They also testified, however, that they thought his follow up, maintenance, and treatments for chest pains were not treatments for an ongoing diagnosis of a disease of the heart. They maintain that

---

3. In reading the provisions in the application together, it is apparent that one could have a pre-existing medical condition as that term is defined on page two of the application and still have coverage. However, if one had been treated for any of the conditions stated in the first question on page one within 60 months of the application, then the applicant would not be eligible for coverage.

whether these statements amounted to a misrepresentation is a fact issue for the jury to decide, especially since Garrett testified that she had no memory of the conversation. Further, the Hornbacks state that their disclosure of Gale's medical history to Garrett at least creates a fact issue as to their claims of negligence and breach of fiduciary duty against Garrett and AMI. The Hornbacks did not cite legal authority to support their arguments in this regard.

As we have noted, the plain meaning of the language in the first question on page one of the application is not ambiguous. Further, the Hornbacks cannot argue that their answers accurately reflect Gale's heart condition. Additionally, although the Hornbacks claim they did not read the application before they signed it, they also acknowledge that no one stopped them from reading it.

The court faced a similar situation in *Commonwealth Life Ins. Co. v. Bruner*, 299 Ky. 335, 185 S.W.2d 408 (1945). Therein, the applicant on a life insurance policy made false statements material to the risk in the application. Upon her son's death, the applicant sought to recover under the policy. While it was clear that the answers given by the applicant in the application were false, the applicant claimed that she did not read it before signing it. Nevertheless, the court held that the statements written in the application by the local agent were actually or constructively known to the applicant and that "she may not thereafter repudiate the answers in the application and recover on the policy." *Id.* at 410. *See also Reserve Life Ins. Co. v. Thomas*, 310 S.W.2d 267, 269–70 (Ky. 1958). In short, whether they read the application or not, the Hornbacks are held to have actual or constructive knowledge

of its contents. Further, by signing the application, the Hornbacks adopted the answers as their own.[4] Thus, we conclude that the circuit court properly determined that the Hornbacks had made misrepresentations that were material to the insurer's acceptance of the risk and that there was no fact issue in this regard.

■ Likewise, we find no error with the court's decision granting summary judgment in favor of Garrett and AMI. The Hornbacks argue Garrett, and through Garrett, AMI acted negligently and breached a fiduciary duty to them in completing their application for coverage. It is uncontested that Garrett read the question to them directly from the form. Further, there is no dispute over the fact that Garrett filled in the answers. Having said that, the Hornbacks acknowledge that, while they did not read the form, they were not prevented from doing so. Further, they were not prevented from filling in the answers themselves. Finally, as a matter of law, the Hornbacks adopted and were responsible for the answers when they signed the application. Thus, regardless of what disclosures were made to Garrett, the responsibility for the answers rests solely with the Hornbacks. Under these circumstances, Garrett and AMI were, as a matter of law, entitled to a judgment in their favor.

The Hornbacks' third and final argument is that a fact issue remains with regard to the good faith of Bankers Life and its underwriting process under KRS 304.14–110(3). Specifically, they contend that Bankers Life "merely move[d] that underwriting process to the period of time following the claim." Citing a law review article, they maintain that such a "post-

---

4. The application itself included language stating that the applicants had read and answered the questions and that they were correct and complete to the best of their knowledge.

claim underwriting" should be held to be fraudulent, illegal, or a bad faith settlement practice. *See* Thomas C. Cady & Georgia Lee Gates, *Post Claim Underwriting,* 102 W.Va.L.Rev. 809 (2000).

 This position has not been adopted by Kentucky courts. KRS 304.19–080(3)(b)2 provides that an insurer may underwrite risks on an individual basis. The questions contained on the application are intended to elicit information for this purpose. An insurance company that issues a policy based on the applicant's answers, without any investigation, is not precluded from raising the defense of fraud or material misrepresentation. *See State Farm Mut. Auto. Ins. Co. v. Crouch,* 706 S.W.2d 203, 206 (Ky.App.1986). When an insured misrepresents material facts on the application, the insurer is justified in denying coverage and rescinding the policy. *See Crouch, supra;* KRS 304.14–110. Such was the case here.

The judgment of the Taylor Circuit Court is affirmed.

ALL CONCUR.