OPINION OF THE COURT
Eugene L. Nardelli, J.
Universal Builders Supply, the plaintiff in action No. 2, is the successor in interest to the SGB Universal companies, defendants in action No. 1. Both will be referred to hereinafter as Universal. American Re-Insurance Company (American Re) and First State Insurance Company (First State) issued excess liability insurance policies which were in effect when an accident occurred at a construction site in Boston, Massachusetts, on or about June 1, 1976. The primary and secondary insurers became insolvent, and on or about March 5, 1986, American Re brought action No. 1 in the Supreme Court for New York County for a declaratory judgment that it was liable only for sums in excess of the underlying insurance (originally $1,000,000). On or about January 6, 1987, Universal brought an action in the Supreme Court for Westchester County for a declaratory judgment that the First State coverage "dropped down” to provide first-dollar coverage to Universal. On March 24, 1987, First State counterclaimed seeking a declaratory judgment that it is liable to Universal only for amounts in excess of the underlying coverage. These actions have been joined for trial in this court by order dated August 21,1987.
American Re moved for summary judgment on its action for a declaratory judgment but, before this court’s decision thereon dated May 27, 1988, it and Universal reached a settlement and the motion became moot. The court’s decision of May 27, 1988 is recalled sua sponte.
Universal has moved to dismiss the consolidated actions because of an action recently commenced by it in February 1988 in Massachusetts for money damages against the two excess insurers. Insofar as the court’s May 27 decision affected this motion, that decision is recalled. Since American Re has settled with Universal, the motion will be discussed as relating only to action No. 2. Universal’s motion is clearly not *377 supportable. Universal, as plaintiff, made the choice of forums by bringing this action for declaratory judgment in January 1987. The practice of seeking a change of venue by starting another action when a prior proceeding has been properly commenced cannot be justified. (Colson v Pelgram, 259 NY 370, 374-375.) That principle applies whether the litigation is commenced by petition or by summons. (Supra, at 375.) Universal now makes arguments and cites authorities that in no way justify dismissal because of a change of strategy 13 months later on the part of the one who brought the action in the first place. To comment on each would be unproductive, but one will serve. Phelan v City of Buffalo (54 AD2d 262 [4th Dept]) is cited for the proposition that whether a case is a proper subject for a declaratory judgment is not determined by circumstances as they existed when the action was instituted but rather by circumstances as they exist when the issues are presented to the court. But there the court was concerned with whether the party had standing to seek the relief, whether he had a matured legally protectible interest such as to assure adverseness, not with a new action instituted over a year later by the original plaintiff.
First State has cross-moved in action No. 2 for an order granting summary judgment in its favor on the ground that it is not obligated to indemnify Universal for any part of the LoGrasso settlement which the now insolvent underlying carriers contracted to cover.
Vincenzo LoGrasso was injured on or about June 1, 1976. At that time Universal had a one-year insurance policy with Ambassador Insurance Co. for a first layer of coverage up to $500,000 in personal liability insurance plus a provision for supplementary payments for (1) expenses incurred, (2) costs taxed against the company in any suit defended by Universal, and (3) all interest on the entire judgment accruing after entry of the judgment. A premium of $80,000 was paid on the policy. Universal also had a one-year policy with Northeastern Fire Insurance Co. for a second layer of coverage for losses between $500,000 and $1,000,000, with a similar provision for supplementary payments. A premium of $25,000 was paid for the secondary coverage. In addition Universal had policies with American Re and First State, each to pay up to $2,000,000 of $4,000,000 in excess of the $1,000,000 covered by the primary and secondary insurers. First State’s premium for eight months was $1,464. The primary and secondary insurers have become insolvent.
*378 In January 1986, a jury verdict awarded Mr. LoGrasso $775,000 and awarded $225,000 to his wife and $37,000 to his children for loss of consortium. Fifty per cent of the loss of consortium award was paid by another construction company. Thus the award against Universal was $906,000. Prejudgment interest was $869,760. Postjudgment interest was $426,192 on December 30, 1987. On December 30, 1987, the action was settled, Universal paying $1,927,882 of the $2,201,942 total settlement.
The First State policy provides that liability shall attach to First State only after the underlying insurers have paid or have been held liable to pay the full amount of their respective net loss liability of $1,000,000 and that then First State shall be liable to pay only the excess thereof up to $2,000,000 of $4,000,000.
The basis for Universal’s prayer for declaratory judgment against First State was that due to the insolvency of the primary insurers, First State (and American Re) are liable to pay the full amount of the January 10, 1986 judgment in favor of the LoGrassos up to the limits of liability contained in their policy. First State prays for an order (1) dismissing Universal’s complaint and (2) for a declaratory judgment that it, First State, is obligated only for that portion of the LoGrasso award in excess of the underlying insurance.
Universal argues that the June 23, 1987 affidavit of Robert J. Kelley, an officer of First State, summarizing the provisions of the policy and stating that it becomes operable once the underlying $1,000,000 has been "paid by or on behalf of the insured” raises issues of fact requiring discovery and precluding summary judgment. That affidavit was clearly a summary —in the ordinary course of events the underlying insurers would have paid claims or reimbursed the insured — and does not require discovery. The court can read the policy and interpret it under the applicable law.
Universal contends that that applicable law is the law of Massachusetts and that Massachusetts law requires excess insurers to drop down and substitute for underlying insurers when the underlying insurers become bankrupt, citing Gulezian v Lincoln Ins. Co. (399 Mass 606, 506 NE2d 123). The most significant contacts with the excess insurance contract, however, are with New York. Mr. LoGrasso’s action was covered by Massachusetts law, but he has been paid. The Massachusetts Insurers Insolvency Fund may be affected by *379 the decision herein, but that factor cannot control in light of the numerous New York contacts with the policy. The address of the insured was stated in the policy as Mt. Vernon, New York; since the policy covered risks anywhere in the world, Massachusetts was not understood to be the principal location of the insured risk (see, Colonial Penn Ins. Co. v Minkoff, 40 AD2d 819 [1st Dept]); it was procured through Universal’s New York agent; the policy was issued and delivered and the premium paid in New York. Universal’s desire to have Massachusetts law apply and indeed to try the issue in Massachusetts is understandable. It initiated its action for declaratory judgment in New York against First State in January 1987. On April 13, 1987, the Supreme Judicial Court of Massachusetts held in two cases that the excess insurer dropped down on the insolvency of the underlying insurer. In Massachusetts Insurers Insolvency Fund v Continental Cas. Co. (399 Mass 598, 506 NE2d 118) the excess policy provided that, if the underlying limit of liability had been "reduced”, the policy became excess of that limit. Thus if the underlying coverage is reduced to zero, "the excess policy in effect provides first dollar coverage” (supra, 399 Mass, at 600, 506 NE2d, at 120). The court said there was at least an ambiguity as to whether the insolvency of the underlying insurer would cause the underlying insurance to be reduced; it resolved that ambiguity against the insurance company. It distinguished cases where the excess policy specifically provided for a drop down when the reduction or exhaustion in the primary coverage was due to the payment of losses. In Gulezian v Lincoln Ins. Co. (supra) Ambassador was, as in the instant case, the insolvent primary insurer. Lincoln’s policy provided that it was excess "over any other valid and collectible insurance”, and since none was collectible from Ambassador, the court found the Lincoln excess policy to have dropped down (supra, 399 Mass, at 611, 506 NE2d, at 126). In each case there was a dissent by Judge O’Connor, stating in Massachusetts Insurers that the underlying limit of ambiguity was unambiguous and could not be reduced except by prior payment and in Gulezian that "limits of liability” unambiguously meant the limits stated in the underlying policy and "limits” cannot be collectible.
Excess liability insurance is a low-cost method of providing extended protection where primary (and secondary) insurance leaves off; its premiums do not reflect the assumption of risk of the primary carrier’s insolvency. (See, Zurich Ins. Co. v Heil Co., 815 F2d 1122, 1126 [7th Cir].) In the instant case it would *380 seem that they do not even reflect the cost of scrutinizing thv financial condition of the primary providers. Those risks and costs are better left with the purchaser of the primary policy. (See, Continental Marble & Granite v Canal Ins. Co., 785 F2d 1258 [5th Cir]; Wurth v Ideal Mut. Ins. Co., 34 Ohio App 3d 325, 518 NE2d 607, 610 [Ct App, Warren County].)
This court has not been directed to any case in which a New York court has allowed excess liability coverage to drop down when the primary insurer becomes insolvent. In Pergament Distribs. v Old Republic Ins. Co. (128 AD2d 760 [2d Dept]), yet another case arising out of the insolvency of Ambassador, the insured argued for such a drop down and sought a declaratory judgment to that effect. Defendant’s motion for summary judgment dismissing the complaint had been denied below and partial summary judgment granted to plaintiff. The Appellate Division for the Second Department reversed and granted defendant’s motion. The insured there had argued that the words "covered” and "not covered” (by the underlying policies) were ambiguous and resolution of that ambiguity should be resolved in its favor. The Appellate Division, however, found that in context they referred to whether the policy insured against a certain risk and did not refer to collectibility (supra, at 761). In Prince Carpentry v Cosmopolitan Ins. Co. (124 Misc 2d 919, 930-931 [Sup Ct, NY County]), it was similarly held that "the excess insurer is not insuring against the insolvency of the primary insurer”. In St. Vincent’s Hosp. & Med. Center v Insurance Co. (117 Misc 2d 665, 668 [Sup Ct, NY County]) it was held that insolvency and/or unidentifiability did not create liability on the part of an excess insurer because such occurrences do not result in claims in excess of the amounts specified in the primary policy.
The policy must be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed. (Breed v Insurance Co., 46 NY2d 351, 355.) What is basic and unequivocal in the instant case is that the coverage is described in the policy as "Excess Umbrella Liability” (item 3). "Excess Umbrella Liability” is a readily understood phrase. It was probably even more readily understood in 1976, when the policy was issued (most of the "drop down” litigation seems to have occurred in the 1980’s). The "Limit of Liability — Underlying Limits” provision of the policy that "liability shall attach to [First State] only after the Underlying Umbrella Insurers have paid or have been held liable to *381 pay the full amount of their ultimate net loss liability” of $1,000,000 for each occurrence and $1,000,000 for each year and that First State "shall then be liable to pay only the excess thereof up to a further” (emphasis supplied) $2,000,000 of $4,000,000 per occurrence and per year is also clear, even standing alone. When it is read in the context of an "Excess Umbrella Liability” insurance policy (see, Pergament Distribs. v Old Republic Ins. Co., supra, at 761), the intention of the parties is clear beyond even a shadow of doubt. No reading of the policy can justify a drop down by the excess insurers into the first million of liability (these round figures would be adjusted, of course, for any erosion of the coverage of the underlying coverage because of payments made). Here there is no language in the policy such as that in Donald B. MacNeal, Inc. v Interstate Fire & Cas. Co. (132 Ill App 3d 564, 477 NE2d 1322) and Reserve Ins. Co. v Pisciotta (180 Cal Rptr 628, 640 P2d 764 [excess insurer would pay on liability claim in excess of "amount recoverable” under underlying insurance]), on which Universal relies to justify a drop down on the excess coverage. Even under Massachusetts law it would seem that the language in the First State policy would preclude a drop down. Under New York law the result is clear: where an excess insurer defines its obligations as they are defined here, its coverage comes into play only with respect to liability in excess of the amounts specified in the underlying insurance policies — it does not become an insurer of the solvency of the underlying insurers. (St. Vincent’s Hosp. & Med. Center v Insurance Co., supra, at 667-668.)
DECISION AND ORDER
The court’s decision of May 27, 1988 is recalled in toto. The issue between American Re and Universal has become moot.
The motion of Universal to dismiss its action against First State is denied.
First State’s cross motion for summary judgment that it is obligated only with respect to that portion of the LoGrasso award in excess of the stated amount of the underlying insurance (as affected by any erosion thereof because of payments by the underlying insurers) and that it has no obligation to pay additional sums by reason of the insolvency of the underlying insurers is granted.