PLAYTEX FP, INC., et al., Plaintiffs,

v.

COLUMBIA CASUALTY COMPANY,
et al., Defendants,

v.

ESMARK, INC., et al., Counterclaim
Defendants.

Superior Court of Delaware,
New Castle County.

Submitted: April 6, 1992.
Decided: May 21, 1992.

*OPINION*

Walter L. Pepperman, II, Andrea L. Rocanelli, Morris, Nichols, Arsht & Tunnell, Wilmington, and William J. McSherry, Jr., James Lawless, IV, Battle Fowler, New York City, and Robert N. Sayler, Covington and Burling, Washington, DC, and Stephen D. Chakwin, Jr., Playtex, Inc., Stamford, CT, for plaintiffs.

Irving Morris, Morris and Morris, and Kevin Gross, Rosenthal, Monhait & Gross, P.A., Wilmington, and William H. Briggs, Jr., Rebecca L. Ross, Garrick Grobler, Ross, Dixon & Masback, Washington, DC, and Julian C. Campbell, Jr., Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, IL, for defendant Columbia Cas. Co.

Howard M. Berg, Berg, Bifferato, Tighe & Cottrell, P.A., Wilmington, and Edward M. Laine, Jeffrey J. Bouslog, Oppenheimer, Wolff and Donnelly, St. Paul, MN, for defendant Intern. Ins. Co., AIU Ins. Co. and Nat. Union Fire Ins. Co.

Stephen P. Casarino, Casarino, Christman & Shalk, Wilmington and Dion J. Sartorio, Tribler & Orpett, P.C., Chicago, IL, for defendant Northwestern Nat. Ins. Co.

Nancy E. Chrissinger, Tybout, Redfearn & Pell, Wilmington, for Delaware Ins. Guar. Ass'n.

Gerald G. Saltarelli, Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, IL, for counterclaim defendants Esmark, Inc., and Beatrice Companies, Inc.

DEL PESCO, Judge.

Playtex and the Delaware Insurance Guarantee Association (DIGA), the plaintiffs in this action, and Columbia Casualty Company (Columbia), National Union Fire Insurance Company (National Union), and International Insurance Company (International), the defendant insurance companies, have submitted cross-motions for summary judgment on the issue of insolvency drop down. Whether or not an excess insurance policy requires insolvency drop down is an issue of first impression in Delaware. After careful consideration of the insurance policies, extensive expert testimony[1], and the pertinent case law, I conclude that these policies do not require insolvency drop down.

The dispute in this case arises over the interpretation of a $200 million dollar umbrella liability insurance program covering Esmark, Inc. from October 1, 1984, to October 1, 1985. The program consisted of numerous primary policies with varying limits of specialized coverage including a primary comprehensive general and automobile liability policy issued by Northwestern National Insurance Company (Northwestern) with a $1 million dollar each occurrence, $7 million dollar aggregate limit[2]; a lead umbrella liability policy with limits of $5 million dollars each occurrence and in the aggregate issued by Mission National Insurance Company (Mission); and several layers of excess umbrella liability insurance which followed form to the Mission policy. Columbia issued an excess umbrella liability policy with limits of $10 million dollar each occurrence and in the aggregate for the layer directly above Mission, and National Union and International issued excess umbrella liability policies sharing the $10 million dollar layer above Columbia. As a subsidiary of Esmark,

---

1. The Court heard expert testimony about the insurance industry and the interpretation of policy language at a hearing, to be referred to in this opinion as the drop down hearing, which was held in this Court on February 10–13, 1992. Citations to testimony will be to the drop down hearing transcript unless otherwise noted.

2. In *Playtex v. Columbia, et al.,* Del.Super., 609 A.2d 1087 (1991), this Court ruled that the Northwestern policy, which had a deductible equal to its limits, was a fronting policy, an articulation of the insured's self-insured retention, issued for the purpose of compliance with state insurance laws.

Playtex was an insured under the Esmark program.[3]

Unlike the majority of insurance contracts, which are written by insurance companies and issued to unsophisticated individuals, the Mission umbrella liability policy, to which the excess insurers followed form, was drafted by Esmark's brokerage firm and presented to prospective lead umbrella insurers. The prospective insurers had an opportunity to negotiate changes to the form. See Playtex v. Columbia, et al., Del.Super., 609 A.2d 1087 (1991) ("Dec. 9 opinion").

At the time the 1984–85 program was being placed, the excess insurance market was moving from a "soft" period, where there was heavy competition among the insurers coupled with a high capacity and low prices, to a "hard" period, where the insurers were attempting to cancel underpriced policies and were limiting capacity. In other words, prices were beginning to rise, and insurers were less willing to offer the high limits that they had provided in the early eighties.[4]

Mission has been declared insolvent, thus causing this dispute over whether or not the Esmark insurance program requires insolvency drop down. Mission has not made payments on any 1984–85 policy year TSS claims. As a result of Mission's insolvency, DIGA has made payments for some, but not all, of the claims. Both Playtex and DIGA assert that the policies require the excess insurers to drop down into the $5 million dollar layer which was occupied by Mission.

Neither party has shown the Court evidence of the parties' intent regarding drop down at the time the insurance program was placed. There is no express provision in the Mission policy or in the relevant portions of the excess insurers' policies about the insurer's obligation in the event of the insolvency of an underlyer. It appears that neither side considered the possibility of insolvency drop down. Therefore, it is up to the Court to examine the policies and evidence about practices in the insurance industry to determine the meaning of the Esmark 1984–85 insurance program.

■ "Where the court is presented with cross-motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law." *Empire of America v. Commercial Credit Co.*, Del Supr., 551 A.2d 433, 435 (1988). In this determination of whether or not the Esmark insurance program for 1984–85 provided for drop down, the only disputed issue is the interpretation of the insurance policies. Under Delaware law, the interpretation of contract language is treated as a question of law. *Klair v. Reese*, Del.Supr., 531 A.2d 219 (1987).

■ "The basic rule of contract construction gives priority to the intention of the parties. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985) (citations omitted). The court should consider the overall purpose of the contracts and of the specific provisions at issue. *Continental Casualty Co. v. Ocean Accident and Guarantee Corp.*, 58 Del. (8 Storey) 338, 209 A.2d 743, 751 (1965). An understanding of the industry is also important to an intelligent interpretation of the meaning of a contract. "[T]he meaning of words used in an agreement can only be known through an appreciation of the context and circumstances in which they were used." *Klair v. Reese*, 531 A.2d at 223; *see also Empire of America*, 551 A.2d at 435. Because of the specialized

---

**3.** The claims at issue in this case are the result of payments Playtex has made due to product liability claims for toxic shock syndrome (TSS) alleged to be caused by Playtex tampons.

**4.** This Court has ruled that the market was hardening at the time the Esmark insurance program was placed. *See* Dec. 9 opinion at 1090.

nature of the language used in the insurance contracts at issue and the fact that these are not "plain English" policies, the court considered expert testimony.[5]

■ There are two factors in this Court's determination that the Esmark Insurance program does not require insolvency drop down. The first is that the purpose of a comprehensive general liability policy is to cover liability, not the solvency of one's insurers. The second is that the policy language, read as a whole and with the benefit of testimony from highly qualified experts on policy construction, unambiguously precludes insolvency drop down in this situation.

■ In interpreting the meaning of a contractual provision, the court should consider the purpose of the contract. *E.I. du Pont v. Shell*, 498 A.2d 1108. The purpose of a liability insurance policy is to insure against third party liability. Mr. Graves D. Hewitt, an expert testifying on behalf of the excess insurers,[6] testified:

> [The Mission policy] is an umbrella liability policy, which means that, for a claim to come under the Mission policy, the expectation is and the intent is that the insured will either have caused or deemed to have caused injury to a third party and that that third party has turned around and said to the insured, you have injured me and I want to be financially made whole.

> The insolvency of the Mission was not caused by the insured in this case. Mission is not alleging that the insured caused the insolvency. Mission is not

asking for financial reimbursement from the insured.

Hewitt, Feb. 11 at 185. Professor Spencer L. Kimball also testified that the Mission policy is a liability policy which does not cover the risk of insolvency. Kimball, Feb. 13 at 19.

The practice employed by the insurance industry in the placement of large umbrella liability programs such as this one is consistent with the conclusion that umbrella liability policies were not intended to provide for insolvency drop down. Underwriters evaluate risks in determining the premium to be charged to an insured. In placing the 1984–85 umbrella liability program, Esmark provided extensive information to prospective lead umbrella insurers describing Esmark's operations and risk history. As is common practice in the excess insurance industry, once Esmark had a commitment from a lead umbrella insurer, in this case Mission, Esmark began to fill the layers of excess coverage above Mission. Excess underwriters often rely on the lead umbrella insurer's evaluation of the risk and sign on for layers of excess coverage based on the lead umbrella premium and the attachment point of a particular layer of coverage, sometimes without seeing the lead umbrella policy form or knowing what insurers occupied the underlying layers. *See* Dec. 9 opinion at 14. The premiums of excess insurance policies are generally much less expensive the more distant the layer of coverage is from the risk.[7] Even if the excess insurers were provided with the information to evaluate the financial

---

5. In order for the Court to understand the policies in their proper context, expert testimony was necessary. The Court heard expert testimony about excess insurance policies: how they work, their history, and the purpose of various provisions. This knowledge assisted the Court in its interpretation of the policies. The policies at issue here are clear and unambiguous when interpreted with the experts' industry-related testimony in mind. *Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473, 478 (1991), which held that where the instrument is clear and unambiguous on its face, the court may not consider parol evidence to interpret the instrument or search for the parties' intent, is distinguishable on that basis.

6. Columbia, National Union and International shall be collectively referred to in this opinion as "the excess carriers."

7. For example, in the Esmark insurance program, the Mission policy's premium was $350,000, or $70,000 per million dollars of coverage. For the layer above Mission's $5 million dollars of coverage, Columbia's premium was $90,000, or $9,000 per million dollars of coverage. For the layer above Columbia and Mission's combined $15 million dollars of coverage, National Union's premium was $22,500, or $4,500 per million dollars of coverage, and International's premium was $20,800, or $4,160 per million dollars of coverage.

risk of their underlyers, the ordinary underwriter cannot measure that risk. Hewitt, Feb. 11 at 210.

Historical evidence bolsters this interpretation of the purpose of liability insurance. Lloyds of London, the author of the original umbrella liability form issued in 1947, prohibited the writing of financial guarantee insurance by its syndicates. If the syndicates had written umbrella liability policies intending for there to be insolvency drop down, the resulting insurance would have involved a financial guarantee. Litigation regarding the issue of insolvency drop down did not begin to appear until the late 1970's; most of the reported drop down cases were decided after 1985. Mr. Richard E. Stewart, an expert testifying on behalf of the plaintiffs, stated that he did not know of any insurance company which offered a policy specifically providing for insolvency drop down in the 1970's and 80's. Stewart, Feb. 10 at 165. *See also* Hewitt, Feb. 12 at 6.

The purpose of a liability insurance program is to protect the insured against third party liability claims, not to insure the solvency of underlying insurers. Absent policy language indicating that the parties intended to provide for insolvency drop down, the court would be adding coverage which was not provided by the contract if it were to require insolvency drop down.

■ The policy language in the Esmark umbrella liability insurance program unambiguously does not provide for insolvency drop down. The absence of an exclusion regarding drop down "is not sufficient to create drop down." Professor Neil A. Doherty, Feb. 11 at 133. "[A] court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions." *Conner v. Phoenix Steel Corp.*, Del.Supr., 249 A.2d 866, 868 (1969). *See also New Process Baking Co. v. Federal Ins. Co.*, 7th Cir., 923 F.2d 62 (1991) (in the absence of clear language imposing the risk of the underlyer's insolvency on the excess insurer, the court declined to create a drop down obligation).

In order to accept the plaintiffs' argument that the policies in the Esmark insurance program require insolvency drop down, the Court must accept both prongs of the plaintiffs' two-pronged argument:

1) Due to the follow form nature of the Esmark insurance program, Section III B, the limits of liability section of the Mission policy, should be used to determine the attachment points of the excess carriers' policies.

2) Section III B requires insolvency drop down because the phrase "amount recoverable" as used in that section means "collectible," and Mission's insurance is not collectible due to its insolvency.

The first prong of the plaintiffs' argument requires an inspection of the follow form provisions form each of the excess umbrella liability policies.

Columbia Casualty Company:

FOLLOWING FORM ENDORSEMENT

IT IS AGREED THAT THE TERMS AND CONDITIONS OF THIS POLICY, **EXCEPT WITH REGARD TO LIMITS AND PREMIUM** ARE CANCELLED AND SUPERCEDED BY THE TERMS AND CONDITIONS OF UNDERLYING MISSION INSURANCE COMPANY POLICY NO. MN037126. (emphasis supplied)

On March 1, 1985, when Beatrice Companies, Inc. acquired Esmark and was added to Esmark's umbrella liability policy, the following provision replaced the above:

IT IS UNDERSTOOD AND AGREED THAT, EFFECTIVE MARCH 1, 1985, THE TERMS AND CONDITIONS OF THIS POLICY, INCLUDING ALL PRIOR ENDORSEMENTS, **EXCEPT WITH REGARD TO AMOUNT OF INSURANCE (LIMITS) AND PREMIUM,** ARE DELETED AND REPLACED IN THEIR ENTIRETY BY THE TERMS AND CONDITIONS OF THE UNDERLYING MISSION NATIONAL INSURANCE POLICY NO. MN 037126, AS AMENDED BY ENDORSEMENT AMENDING CERTAIN PROVISIONS OF MISSION NATIONAL INSURANCE

POLICY NO. MN 037126. (emphasis supplied)

---

National Union Insurance Company's following form language can be found on its declarations page:

The Company agrees with the Insured named below, in consideration of the premium paid and **subject to all the terms and conditions set forth below** that the insurance afforded by this policy shall follow all the terms and conditions of Policy Number MN 037126 issued by Mission National Insurance Company including all renewals and rewrites thereof. (emphasis supplied)

Below this statement on the declarations page the limits of liability and premium are specified.

---

International Insurance Company:
IT IS UNDERSTOOD AND AGREED THAT THIS POLICY FOLLOWS THE EXACT TERMS AND CONDITIONS AS THE IMMEDIATE UNDERLYING POLICY AS ON FILE WITH INTERNATIONAL INSURANCE COMPANY (**EXCEPT FOR THE LIMIT OF LIABILITY, THE ADDITIONAL CONDITIONS STATED IN THIS ENDORSEMENT, AND THE PREMIUM**) AND ALL PRE-PRINTED TERMS AND CONDITIONS IN THE FORM ATTACHED TO THIS POLICY ARE DELETED TO THE EXTENT THAT THEY VARY FROM OR ARE INCONSISTENT WITH THE TERMS AND CONDITIONS OF THE UNDERLYING POLICY. (emphasis supplied)

---

The result of the follow form provisions is to cancel the excess policies' language, except for limits, premium, and any other specified exclusions, and replace it with the language of the Mission policy. Since each of the excess carriers has retained its own limits through its follow form provision, the next logical step in an effort to determine the attachment points of the excess insurers is to examine the provisions found in the excess insurers' policies defining their limits of liability.

The Columbia policy's limits of liability are listed in box 4 of the declarations page: $10,000,000. CSL [combined single limit] EACH OCCURENCE/AGGREGATE EXCESS OF $5,000,000. CSL EACH OCCURRENCE/AGGREGATE EXCESS OF PRIMARIES

This language was amended, effective October 1, 1984, to read as follows: $10,000,000. CSL EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE EXCESS OF $5,000,000. CSL EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE EXCESS OF PRIMARIES.

National Union's limit of liability section, as defined on the National Union declarations page, reads as follows: $5,000,000. CSL P/O [part of] $10,000,000. CSL XS $15,000,000. CSL EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE EXCESS OF UNDERLYING

Finally, the International policy describes its limit of liability as item 6 of its declarations page: $5,000,000 P/O $10,000,000 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE EXCESS OF THE LIMITS STATED IN ITEM 5 ABOVE.

Item 5 states: UNDERLYING INSURANCE: UMBRELLA LIABILITY IN THE AMOUNT OF $15,000,000 EACH OCCURRENCE AGGREGATE WHERE APPLICABLE EXCESS OF PRIMARY INSURANCE OR SIR [self-insured retention]. PRIMARY UMBRELLA: MISSION INSURANCE COMPANY #MN037126. IMMEDIATE UNDERLYING POLICY: COLUMBIA CASUALTY #RDX9176445.

Each of the excess policies makes it clear that it applies in excess of a specified dollar amount of coverage, and places that dollar amount excess of underlying or primary insurance. Columbia attaches "... EXCESS OF $5,000,000. CSL EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE EXCESS OF PRI-

MARIES...." National Union states that it applies "XS $15,000,000. CSL EACH OCCURRENCE AND ANNUAL AGGRE-GATE WHERE APPLICABLE EXCESS OF UNDERLYING." The International policy is more explicit. It specifies that it applies excess of $15,000,000 dollars and goes on to state that Columbia and Mission are underlying insurers. Since the excess policies do not define the underlying or primary insurance below the specified dollar amounts, it is necessary to look to the Mission policy for further explanation.[8]

Mission Section III B reads as follows:

B. WITH RESPECT TO ULTIMATE NET LOSS ARISING OUT OF TOXIC SHOCK SYNDROME:

THE COMPANY SHALL BE LIABLE FOR $5,000,000 ULTIMATE NET LOSS EACH OCCURRENCE, EVENT, OFFENSE OR ACT, ERROR OR OMISSION NOT TO EXCEED $5,000,000 ULTIMATE NET LOSS IN THE AGGREGATE FOR EACH AN-NUAL PERIOD DURING THE CUR-RENCY OF THIS POLICY IN EX-CESS OF:

(1) THE **AMOUNT RECOVERABLE UNDER THE UNDERLYING IN-SURANCE SET FORTH UNDER SCHEDULE A** OR ANY RENEW-ALS OR REPLACEMENTS THEREOF; UNDER COVERAGE A, OR

(2) UNDER COVERAGE B, SELF–IN-SURED RETAINED LIMIT OF $1,000,000 ULTIMATE NET LOSS EACH OCCURRENCE, EVENT, OFFENSE OR ACT, ERROR OR OMISSION WITH RESPECT TO ULTIMATE NET LOSS NOT COV-ERED BY UNDERLYING INSUR-ANCE SET OUT IN SCHEDULE A

...

ALL SUCH AMOUNTS AND/OR RE-TAINED LIMITS ARE SUBJECT TO A MAXIMUM OF $7,000,000 ULTI-MATE NET LOSS IN THE AGGRE-GATE FOR EACH ANNUAL PERI-OD DURING THE CURRENCY OF THIS POLICY UNDER III B(1) AND III B(2) ABOVE. (THIS AGGRE-GATE PROVISION WITH RESPECT TO III B(1) APPLIES ONLY TO THE FOLLOWING POLICY(IES) UNDER SCHEDULE A):

NORTHWESTERN NATIONAL IN-SURANCE COMPANY COMPRE-HENSIVE GENERAL AND AUTO LI-ABILITY POLICY NO. CLA 255714 (emphasis supplied)

Thus, a reading of Section III B in conjunction with the limits of liability provisions of Columbia, National Union and International reveals that with respect to product liability claims related to toxic shock syndrome, the $5 million dollar Mission policy attaches above Northwestern's $1 million each occurrence / $7 million aggregate limits, which are listed in Schedule A. Columbia's $10 million dollar policy attaches above the Mission and Northwestern limits; and National Union and International attach above Columbia and Mission's $15 million dollar combined limits and Northwestern's limits.

Because the excess carriers' follow form provisions specifically exclude limits of liability, the plaintiffs' argument that the Mission provision for limits of liability, Section III B, defines the excess carriers' limits is erroneous. The first prong of the plaintiffs' argument is therefore rejected. The limits of liability provisions in the policies above Mission incorporate Section III B of the Mission policy into the excess policies only to the extent that Section III B further defines the attachment point of Mission with respect to TSS claims.

**8.** The Mission policy, as the lead umbrella liability policy, sat above 29 different primary policies listed on Schedule A of the Mission policy, each covering different types of liability, with limits ranging from $100,000 to $300,000,000 dollars each occurrence. In order to properly determine the attachment points within the Esmark insurance program, the first step is to determine the type of loss that is involved and find the limits for the appropriate primary insurance on Schedule A. Mission attaches excess of that amount. The number of underlyers and the variety in limits among them made it necessary for Mission and the excess carriers to express their attachment points with phrases such as "excess of underlying" or "excess of primaries."

The second prong of the plaintiffs' argument is that the phrase "amount recoverable" meant "collectible," or "real money." Using this interpretation, the plaintiffs assert that since Mission is insolvent, the insurance under the Mission policy is not an "amount recoverable," and therefore the excess carriers must drop down and pay the claims in the Mission layer.

The excess carriers, on the other hand, argue that the phrase "amount recoverable" unequivocally means "covered" or "limits of liability" in the excess insurance industry. Mr. Hewitt testified that Section III B had the same meaning as a similar section in the insuring agreement, which reads, " ... IN EXCESS OF THE TOTAL APPLICABLE LIMITS OF LIABILITY OF UNDERLYING INSURANCE SET FORTH UNDER SCHEDULE A...." According to Mr. Hewitt, the phrases "amount recoverable" and "limits of liability" may be used interchangeably. Hewitt, Feb. 11 at 204. *See also* Kimball, Feb. 13 at 37–38.

Both the plaintiffs and the defendants have brought cases to the attention of the Court which support their respective positions. There are numerous opinions from other jurisdictions addressing the issue of insolvency drop down, many of which involve interpretations of the meaning of "amount recoverable."

A minority of jurisdictions have ruled that the phrase "amount recoverable" unambiguously means collectible or actually recoverable and, absent an express exclusion, requires an insurance policy to drop down. *Sifers v. General Marine Catering Co.*, 892 F.2d 386 (5th Cir.1990); *McGuire v. Davis Truck Services, Inc.*, La.App., 518 So.2d 1171, *cert. denied*, La., 526 So.2d 791 (1988); *Republic Insurance v. North American Phillips*, 1991 WL 35617, 1991 Conn.Super. LEXIS 589 March 8, 1991; see also *Lechner v. Scharrer*, 145 Wis.2d 667, 429 N.W.2d 491 (App.1988). All of these cases except *Republic* involved situations where there was one umbrella insurer which was being asked to drop down to replace a scheduled primary insurer. The limits of liability language involved in those cases came directly from the defendant umbrella insurer's policy; there was no follow form situation as we have in this case.

*Republic* involved a very similar factual situation to the case at hand. The plaintiff insurers in *Republic* sought a judgment declaring that they were not liable for claims arising from an accident involving one of the insured corporation's employees. They were excess insurers which followed form with the exception of premium and limits of liability to a lead umbrella carrier's policy, and the lead umbrella carrier, Transit, had become insolvent. The limits of liability clause of the Transit policy stated that the company's liability was in excess of "[t]he amount recoverable under the underlying insurance as set out in Schedule A attached...." The court ruled that, under the follow form provisions, the limits of liability of the excess carriers' policies would be inconsistent with the Transit policy in that the dollar amounts of the limits would be different, but that the general operative language of Transit's limits of liability provision would be incorporated into the excess policies. The court, quoting *Sifers*, ruled that the words "amount recoverable" were unambiguous and meant collectible; therefore, the excess policies must drop down. Independent of that analysis, the court ruled that if the language were ambiguous, the ambiguity would be resolved against the insurance company. Connecticut applies the rule of *contra proferentem* to construe ambiguous insurance policies against the insurers.

*Reserve Ins. v. Pisciotta*, 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (1982), has been influential in the area of insolvency drop down. The policy at issue was boat liability coverage under a standard policy. In *Pisciotta*, the Supreme Court of California ruled that the term "amount recoverable," as used in a limits of liability provision similar to the one in the Mission policy, was amenable to two reasonable interpretations: first, that the excess insurer is liable for amounts over the dollar limits of the underlying policy; and second, that the excess insurer is liable for anything above the amount actually collectible from the underlying insurer. Based on this interpretation,

the court ruled that the policy was ambiguous and applied the doctrine of *contra proferentem* to construe it in favor of the insured. A number of other jurisdictions have based their decisions in favor of insolvency drop down on the application of *contra proferentem* after finding that the policies were ambiguous. *Donald B. MacNeal, Inc. v. Interstate Fire & Casualty Co.*, 1st Dist., 132 Ill.App.3d 564, 87 Ill.Dec. 794, 477 N.E.2d 1322 (1985) ("amount recoverable" language in limits of liability provision is ambiguous and must be construed in favor of the insured); *McGuire v. Davis Truck Services, Inc.*, 518 So.2d 1171 (since the term "amount recoverable" in the limits of liability provision means collectible, and that interpretation conflicts with the loss payable condition, the policy is ambiguous and should be interpreted in favor of the insured); *Alabama Insurance Guaranty Assoc. v. Magic City Trucking Service, Inc.*, Ala., 547 So.2d 849 (1989) (after noting that the use of both "collectible" and "recoverable" indicate an agreement to drop down, the court ruled that the excess policy, which used the word "collectible" in the limits of liability section, was ambiguous and should be construed in favor of the insured).

In addition to the cases which found in favor of insolvency drop down based on the meaning of the words "amount recoverable" or the ambiguity caused by those words, there were several cases in which the court ruled against drop down but noted in dicta that the words "amount recoverable" could require drop down. *U.S. Fire Ins. Co. v. Charter Financial Group*, 7th Cir., 851 F.2d 957 (1988); *American Re-Insurance Co. v. SGB Universal Builders Supply Inc.*, Sup.Ct.N.Y., 141 Misc.2d 375, 532 N.Y.S.2d 712 (1988); *Benton v. Long Manufacturing, Inc.*, La.App., 550 So.2d 859 (1989); *Central Waste Systems v. Granite State Ins. Co.*, 231 Neb. 640, 437 N.W.2d 496 (1989); *Denny's Inc. v. Chicago Ins. Co.*, 234 Cal.App.3d 1786, 286 Cal. Rptr. 507 (1991); *Highlands Ins. Co. v. Gerber Products Co.*, D.Md., 702 F.Supp. 109 (1988); *Hudson Ins. Co. v. Gelman Sciences Inc.*, N.D.Ill., 706 F.Supp. 25 (1989), *aff'd*, 7th Cir., 921 F.2d 92 (1990);

*Mission National Ins. Co. v. Duke Transportation Co., Inc.*, 5th Cir., 792 F.2d 550 (1986). None of these cases, except *Benton*, involved policies which used the words "amount recoverable." In *Benton*, the insured, a manufacturing company, had unilaterally reduced the limits of its underlying insurance. The court ruled that there was no drop down due to the reduction of the underlying limits, relying on the maintenance of underlying insurance clause. In setting out the limit of liability provision, which had "amount recoverable" language similar to that used by Mission, the court pointed out in a footnote that it was not interpreting the meaning of that provision in the case of an insolvent underlyer.

In cases where the insurance policies at issue used the phrase "amount recoverable," the majority of the courts have ruled that the policies, when read as a whole, were unambiguous in precluding insolvency drop down. *Hoffman Construction Co. v. Fred S. James & Co.*, 106 Or.App. 329, 807 P.2d 808 (1991) (the court ruled that if it were to accept the plaintiffs' contention that "amount recoverable" means "collectible," the Loss Payable provision would be rendered meaningless); *Morbark Industries, Inc. v. Western Employers Ins. Co.*, 170 Mich.App. 603, 429 N.W.2d 213 (1988) (amount recoverable wording on declarations page clarified by insuring agreement); *Radiator Specialty Co. v. First State Ins. Co.*, W.D.N.C., 651 F.Supp. 439 (1987) (amount recoverable language in limits of liability provision is unambiguous when read in conjunction with the insuring agreements, definitions, and conditions of the policy); *Southeast Atlantic Cargo Operators, Inc. v. First State Ins. Co.*, 197 Ga. App. 371, 398 S.E.2d 264 (1990) (amount recoverable language on the declarations page limits of liability section does not negate more specific provisions in the body of the policy); *Werner Industries v. First State Ins. Co.*, 112 N.J. 30, 548 A.2d 188 (1988) (taken in its entirety, the policy, which covered commercial risks, was procured through a sophisticated broker, and used amounts recoverable language on its

declarations page, was found to be unambiguous); *The Flintkote Co. v. American Mutual Liability Ins. Co.*, Cal.Super.Ct., City and County of San Francisco, No. 805–594 (Dec. 3, 1991) (as the *Pisciotta* court did not establish that the phrase "amount recoverable" is inherently ambiguous, the court ruled that after considering the contract as a whole, the phrase does not present any ambiguity); *McNeal v. First State Ins. Co.*, E.D.Penn., Civ. A. Nos. 85–3927, 85–4087, 1986 WL 4477 (April 10, 1986) (although it would be necessary to decide whether it would be reasonable to believe that the parties intended drop down if limits of liability provision using amount recoverable language stood alone, when read in conjunction with other policy provisions the policy clearly precludes drop down).

█ It is unnecessary for the Court to rule at this time on the second prong of the plaintiffs' argument, whether the words "amount recoverable," as used in Section III B(1) of the Mission policy, require drop down. Under the excess carriers' follow form provisions, which explicitly except limits of liability and premium, Section III B of the Mission policy is incorporated into the excess carriers' policies only to the extent that it further defines the attachment point of Mission. A careful reading of Section III B reveals that the words "amount recoverable" refer to "the underlying insurance set forth under Schedule A." In the case of TSS coverage, only the Northwestern policy is underlying insurance set forth under Schedule A. Since Mission is not "underlying insurance set forth under Schedule A," the words "amount recoverable" do not apply to Mission. Only if one were to assume that Northwestern's policy were not a fronting policy, that there were claims payable under the Northwestern policy, and that Northwestern had become insolvent, would one reach the question of whether "amount recoverable" as used in this policy requires insolvency drop down.

The plaintiffs also cite the Maintenance of Underlying Insurance provision of the

Mission policy as evidence that the excess insurers' policies should drop down:

O. *MAINTENANCE OF UNDERLYING INSURANCES*

IT IS A CONDITION OF THIS POLICY THAT THE UNDERLYING INSURANCE(S) AS SET OUT IN SCHEDULE A (OR RENEWALS OR REPLACEMENTS THEREOF) SHALL BE MAINTAINED IN FULL EFFECT, EXCEPT FOR ANY REDUCTION OF THE AGGREGATE LIMIT OR LIMITS APPLICABLE THERETO. FAILURE OF THE INSURED TO COMPLY WITH THE FOREGOING SHALL NOT INVALIDATE THIS POLICY, BUT IN THE EVENT OF SUCH FAILURE, THE COMPANY SHALL ONLY BE LIABLE TO THE SAME EXTENT AS IT WOULD HAVE BEEN HAD THE INSURED COMPLIED.

The maintenance of underlying insurances condition was amended by an endorsement to the Columbia and International policies (Endorsement 9) effective March 1, 1985, the date Beatrice was added to the Esmark insurance program:[9]

O. *MAINTENANCE OF UNDERLYING INSURANCES*

IT IS A CONDITION OF THIS POLICY THAT THE UNDERLYING INSURANCE(S) AS SET OUT IN THE SCHEDULE OF UNDERLYING INSURANCES APPLICABLE TO THIS POLICY (OR RENEWALS OR REPLACEMENTS THEREOF NOT MORE RESTRICTIVE IN COVERAGE) SHALL BE MAINTAINED IN FULL EFFECT UNDER THE SAME TERMS AND CONDITIONS AS THIS POLICY, EXCEPT FOR ANY REDUCTION OF THE AGGREGATE LIMIT OR LIMITS APPLICABLE THERETO. FAILURE OF THE INSURED TO COMPLY WITH THE FOREGOING SHALL NOT INVALIDATE THIS POLICY, BUT IN THE EVENT OF SUCH FAILURE THE COMPANY SHALL ONLY BE LIABLE TO THE SAME EXTENT AS IT

---

**9.** National Union did not add Endorsement 9 to its policy.

WOULD HAVE BEEN HAD THE INSURED COMPLIED.

The maintenance of underlying insurance endorsement was accompanied by the following intent provision:

VI. *INTENT*

THE INTENT OF THE AMENDMENT TO PARAGRAPH O (MAINTENANCE OF UNDERLYING INSURANCE) OF SECTION V OF THE MISSION NATIONAL INSURANCE COMPANY POLICY NO. MN 037126 AND SECTION V (SUBROGATION: BEATRICE AS INSURER) OF THIS ENDORSEMENT IS:

A. TO PREVENT THIS POLICY FROM APPLYING OVER REDUCED OR EXHAUSTED UNDERLYING LIMITS (I.E., "DROPPING DOWN") CAUSED BY: (1) THE APPLICATION OF DIFFERENT OR MORE RESTRICTIVE TERMS AND CONDITIONS (SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY EXCLUSIONS) IN UNDERLYING POLICIES; (II) FAILURE TO PLACE ALL OR PART OF ANY UNDERLYING POLICY OR LAYER; OR (III) CANCELLATION OF ALL OR PART OF ANY UNDERLYING POLICY OR LAYER, SPECIFICALLY INCLUDING WITHOUT LIMITATION REDUCTION OF ALL OR PART OF THE AMOUNT OF INSURANCE (LIMIT).

B. BEATRICE COMPANIES, INC., SHALL BE SELF–INSURED WITH RESPECT TO ANY OF THE COVERAGE DEFICIENCIES (I.E., "GAPS") SET FORTH IN THE IMMEDIATELY PRECEDING PARAGRAPH AND, AS TO ANY SUCH SELF–INSURANCE, BEATRICE COMPANIES, INC., SHALL BE TREATED AS AN INSURER FOR PURPOSES OF SUBROGATION AND REIMBURSEMENT FOR ANY PAYMENTS MADE AS A SELF–INSURER.

Endorsement 9 was offered to the excess insurers at the time that Beatrice acquired Esmark and was added to the Esmark insurance program. At that time, the market had hardened and the insurers were looking for ways to eliminate underpriced contracts from their portfolios. The addition of Beatrice was a material change that caused several insurers to limit their coverage or refuse to cover Beatrice. The purpose of Endorsement 9 was to ensure the insurers that remained with the program that they would not have to drop down into layers that had been vacated or reduced due to the addition of Beatrice.

 The maintenance of underlying insurance provision is a condition which obligates the insured to maintain the insurance which the insured has represented as underlying insurance to the umbrella carrier. *See, e.g., Benton,* 550 So.2d 859; *McGuire,* 518 So.2d 1171; *Hudson,* 706 F.Supp. 25, 27 ("The [maintenance of underlying insurance] clause did not enlarge other provisions in the contract, especially those describing when the umbrella insurer would be liable."). The excess insurers rely on these representations in that they expect the named underlyers to have evaluated the risk and determined it to be acceptable. Hewitt, Feb. 11 at 220; Professor Spencer Kimball, Feb. 13 at 51; Mr. George M. Gottheimer, Jr., Feb. 12 at 181. It is also important to the excess carriers that underlying insurance be maintained because many of the insurance companies which specialize in selling umbrella and excess umbrella insurance are not capable of handling large numbers of small claims, and therefore depend on the underlying insurers for claims handling. Stewart, Feb. 11 at 15; Hewitt, Feb. 11 at 221; Kimball, Feb. 13 at 51.

Since the maintenance of underlying insurance is a condition of the Mission policy, the first sentence of the condition read alone could deprive the insured of coverage if the insured were to fail to maintain its underlying insurance. To protect the insured from that possibility, the second sentence of the condition states that if the insured fails to comply, the insurer "shall only be liable to the same extent as it would have been had the insured complied." The plaintiffs argue that "since the provision states that the policy will not drop down if the insured fails to comply, the clear import of this provision is that if

the insured does comply with the first sentence, the excess carrier will drop down." Plaintiffs' Opening Brief at 27. They contend that Mission's insolvency caused a "reduction" in the underlying insurance which was not the fault of the insured, and therefore the excess carriers should drop down. The insurers, on the other hand, argue that the word "reduction" refers to reduction by payment of claims, and that if it were to be interpreted otherwise the interpretation would eliminate the purpose of the condition.

Only one case presented to this Court relied solely upon language referring to the reduction of underlying limits as a basis for imposing insolvency drop down liability on excess insurers. In *Massachusetts Insurers Insolvency Fund v. Continental Casualty Co.*, 399 Mass. 598, 506 N.E.2d 118 (1987), the policy provided that if the underlying limit were reduced, the policy would become excess of the reduced limit.[10] The court cited several cases which had ruled against insolvency drop down where there was language requiring the reduction to be by payment of claims and then ruled that since this policy did not require reduction to be by payment of claims, drop down must occur.

Another case, *Interco Inc. v. National Surety Corp.*, 8th Cir., 900 F.2d 1264 (1990), took a middle ground. In that case, both the insuring agreement and the maintenance of underlying insurance clause specified that "exhaustion" must be by the payment of claims. After determining that an interpretation in favor of insolvency drop down would undermine the plain meaning of the limit of liability clause, which required exhaustion to be "solely by reason of losses paid," the court ruled that the limits of liability clause must be read in conjunction with the maintenance clause, which the court stated would govern an instance of insolvency. *Id.*, 900 F.2d at 1268. The court went on to hold that "[it] is clear that the parties intended 'exhaustion' to mean payment and not insolvency." *Id.* The *Interco* court did not discuss

whether its result would be different if the maintenance clause had not included language referring to reduction by the payment of claims.

Most of the cases which discuss the maintenance of underlying insurance provision do not rely on it in their determination of whether or not the policy requires insolvency drop down. *See, e.g., Federal Ins. Co. v. Scarsella Bros., Inc.*, 9th Cir., 931 F.2d 599 (1991) (relies on the ambiguity of the term "exhausted" in the insuring agreement); *Central Waste*, 437 N.W.2d 496 (relies on the use of the word "covered" in the limits of liability section of the excess policy); *Highlands*, 702 F.Supp. 109 (states that the scope of coverage is found in provisions other than the maintenance of underlying insurance provision); *Hudson*, 706 F.Supp. 25 (relies on the lack of ambiguity in the limits of liability provision in refusing to require insolvency drop down). *But see, Gibson v. Kreihs*, La.App., 538 So.2d 1057 (1989) (no drop down found where maintenance of underlying insurance provision specifically stated that the excess insurer would apply excess of the limits of liability found in Schedule A if the underlying insurer became insolvent). *Central Waste* used the fact that the maintenance of underlying insurance clause included language requiring reduction to be by the payment of claims as further evidence that there was no intent for drop down. *Central Waste*, 437 N.W.2d 496.

Keeping in mind that Condition O of the Mission policy is a condition meant to obligate the insured to maintain its underlying insurance, it is clear that the provision is not intended to expand the insured's coverage and force the excess insurers to drop down. "The words that are in particular clauses must be interpreted in relation to the purposes of those clauses and not simply picked out and collected in some place where they can be used in the aggregate to create arguments for any proposition that is not related to the place

---

**10.** The opinion did not mention which policy provision was the source of the language refer- ring to reduction.

where they are found in context." Kimball, Feb. 13 at 24. *E.I. du Pont v. Shell,* 498 A.2d 1108.

Read as a whole, in the context of the purpose and history of excess umbrella liability and the meaning of insurance terms used in the contracts, the policy language unambiguously precludes drop down.